**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Mario MIRANDA–PEREZ and Juan Rojas-Fuentes, Defendants-Appellees.**

**No. 84–1645.**

United States Court of Appeals, Fifth Circuit.

June 27, 1985.

Helen M. Eversberg, U.S. Atty., El Paso, Tex., Sidney Powell, San Antonio, Tex., for plaintiff-appellant.

Mike Barclay, John B. Hemphill, Alaine, Tex., for defendants-appellees.

Before WISDOM, WILLIAMS, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

A federal grand jury returned a two-count indictment charging Mario Miranda-Perez and Juan Rojas-Fuentes, respectively, with one count of interstate transportation of a stolen motor vehicle in violation of 18 U.S.C. § 2312. After a hearing, the district court granted the defendants' mo-

tion to suppress evidence obtained as a result of an allegedly unconstitutional stop of each defendant's vehicle. The government has timely appealed from the district court's findings made pursuant to Fed.R. Crim.P. 12(e). It contends that reasonable suspicion justified the stop of the defendants' vehicles. We conclude that the stop of the vehicles was justified by reasonable suspicion; consequently, the evidence should not have been suppressed.

## I. *Facts*

On the evening of April 17, 1984, United States Border Patrol agents Wayne Wiemers and Robert Ordonez were patrolling the border area in a northerly direction on Highway 67 between Presidio and Marfa, Texas.[1] Agent Wiemers, who testified at the suppression hearing, is a veteran of ten years with the border patrol in the Presidio area. During that time, he has participated personally in approximately fifty cases involving stolen motor vehicles. In addition, he was familiar with an equal number of similar cases as a result of the work of other agents in his office.

Through his accumulated experience, Wiemers had learned that approximately ninety-five percent of the stolen vehicles in the border area were new cars which had been stolen from dealer lots; that ninety-nine percent of the stolen cars were apprehended on Highway 67 between Presidio and Marfa; and approximately seventy percent of the stolen vehicles were four-wheel drive vehicles being taken to Mexico—usually to be exchanged for drugs. In addition, in only one case did a person other than the driver occupy a vehicle that had been stolen.

At approximately 10:00 p.m. the two agents spotted two cars approaching—driving south toward Mexico and traveling close together at approximately forty to forty-five miles per hour. The first car was a black 1984 Chevrolet Camaro Z-28, and the second was a red and white 1984 Chevrolet Blazer—a four-wheel drive vehicle. Because they were watching for the

---

1. Presidio is a small town on the Texas-Mexico border in Southwest Texas; Marfa, a town of approximately 2500 persons, is sixty miles north of Presidio on Highway 67.

license plates of known alien smugglers, they noticed that neither of the approaching cars had front license plates.[2] Both cars, however, had California license plates on their back bumpers and the agents knew that California requires a front and back license plate on each vehicle.

The agents suspected that the cars were stolen and made a u-turn to get a better look. Although the Camaro and the Blazer were not exceeding the speed limit, the brake lights on the two cars illuminated when the marked, border-patrol car made the u-turn. The agents then pulled behind the Blazer and observed that there was no mud or grease on the rear axle. They concluded that the Blazer was new—perhaps only recently taken from the dealer's lot. In addition, only the driver could be seen in the vehicle. The rear axle of the first car, the Camaro, was also free of mud or grease and led the agents to also conclude that it was new. Further, only one occupant could be seen in the Camaro.

Their suspicions firmed that the two cars were stolen, the agents radioed the license number of each vehicle to their dispatcher for a registration check. They then passed the Camaro, and drove ahead to await the dispatcher's answer. He returned their call in several minutes but advised them that the computer had broken down, and that he could not check the registration. Meanwhile, the two vehicles were still traveling in tandem and passed the agents' marked car, now only seventeen miles from the border. The agents then pulled behind the Blazer and turned on their red lights. The Blazer did not stop so the agents activated the siren. When the Blazer did stop, it was two miles closer to the border.

The driver of the Blazer was Juan Rojas-Fuentes. In response to questioning from the agents, he claimed that he had title to the Blazer. He produced a valid Guatemalan passport and a California registration for the car. When questioned about discrepancies in the title to the vehicle,[3] Rojas changed his story and said it belonged to the man in the Camaro ahead of him. Appearing to the agents that the title in some way had been falsified, they then called ahead to another border patrol agent and requested that the Camaro be stopped. Upon stopping the Camaro, the agent discovered that the driver was Mario Miranda-Perez.

## II. *Discussion*

The central question raised by this appeal, whether the stop of the appellees' vehicles by border patrol agents Wiemers and Ordonez violated appellees' Fourth Amendment rights, has become somewhat clouded because of the factual findings by the district court. In addition, the district court restricted its inquiry to whether the articulable facts generated in the agents a reasonable suspicion that illegal aliens were being transported into the United States. The court instead should have inquired whether the articulable facts generated in the agents a reasonable suspicion that the cars were stolen and had been transported in interstate commerce. *See United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). Focusing our analysis upon the appropriate inquiry, the question, and consequently the answer, becomes clear.

In deciding the constitutionality of the stop, the district court relied upon the standard set out in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In that case, the Supreme Court held that "except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with reasonable inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at

---

2. In their experience, vehicles, typically with New Mexico license plates, would drive south to the border to pick up illegal aliens and smuggle them into this country.

3. The record does not clarify what the discrepancies are, nor were counsel at oral argument helpful on this matter. Agent Wiemers did testify, however, that the title appeared to have been falsified.

884, 95 S.Ct. at 2581. In addition, as we have noted, the Court set out the following factors, though not exclusive, which may be considered in deciding whether reasonable suspicion exists to stop a vehicle in the border area:

characteristics of the area in which the vehicle is encountered, including proximity to the border, usual traffic patterns, and history of illegal alien traffic; type and appearance of the vehicle, including whether it appears heavily loaded; behavior of the driver; and number, appearance, and behavior of the passengers.

*United States v. Garcia,* 732 F.2d 1221, 1223 (5th Cir.1984) (citing *Brignoni-Ponce,* 422 U.S. at 884–85, 95 S.Ct. at 2582).

After citing the *Brignoni-Ponce* standard and factors, the district court's opinion stated:

this Court notes that not only did the roving border patrol stop occur because the federal agent had a hunch that the vehicles were stolen and not because the vehicles contained illegal aliens, but that such stop occurred several score [sic] of miles north of the border as the vehicles *approached the border.* This Court is hard pressed to imagine a weaker scenario for making a roving border patrol stop.

(emphasis in original). Concluding that no "objective justification" existed for the stop of the appellees' vehicles, the district court granted the motion to suppress the arrest and any evidence seized in the arrest.

 The government argues that the stop of appellees' vehicles need be justified only by reasonable suspicion. Rather than relying upon *Brignoni-Ponce,* however, the government relies upon *United States v. Shaw,* 701 F.2d 367, 377 n. 4 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984), and other cases which essentially restate the standard for investigatory stops set forth in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We agree that the *Terry* standard is applicable here; more importantly,

we conclude that the factors enunciated in *Brignoni-Ponce,* while well-suited to cases in which the transportation of contraband or illegal aliens is suspected, are not well-suited to cases such as this where transportation of stolen vehicles is suspected.

The Supreme Court has stated that "[t]he Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of [a] vehicle...." *Cortez,* 449 U.S. at 417, 101 S.Ct. at 694–95. To support this proposition, the Court cited, *inter alia, Brignoni-Ponce,* 422 U.S. at 878, 95 S.Ct. at 2578 and *Terry,* 392 U.S. at 16–19, 88 S.Ct. at 1877–78. Citing both cases again, the Court then went on to state that "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." (footnote omitted). Thus, the reasonable suspicion standard reaches to stops for the purpose of investigating not only suspected smuggling of contraband or transportation of illegal aliens but also, in a broader sense, for investigating suspected *criminal activity.* While border patrol agents are predominantly involved with the prevention of contraband smuggling and illegal alien trafficking, they often have occasion to suspect and interdict other criminal activity such as exists in this action. Thus, the mere fact that these stops were effectuated near the border and by border patrol agents does not require the district court or this Court to utilize the *Brignoni-Ponce* factors in deciding whether the officers had reasonable suspicion to stop the vehicles.

The district court's analysis, therefore, of whether the articulable facts before the agents created a "reasonable suspicion" was distorted by its application of the factors set out in *Brignoni-Ponce.* The court concluded that reasonable suspicion was lacking because (a) the officers suspected that the vehicles were stolen and not that they contained illegal aliens, (b) the vehicles were *approaching* the border, and (c) the stop occurred "several score [sic] of miles north of the border." Not-

withstanding uncontroverted testimony that the stop occurred only seventeen or eighteen miles from the international border, the southerly direction in which the vehicles were traveling, rather than preclude a finding of reasonable suspicion, lends support for such a finding since, the record reveals, stolen vehicles were often driven across the border and exchanged for drugs.

We believe that the district court's application of the *Brignoni-Ponce* factors prevented it from properly analyzing whether the articulable facts, which it found were before the border patrol agents, raised a reasonable suspicion that the vehicles were stolen. In addition, we note that the court also did not take into account agent Wiemer's past experiences with stolen vehicles and his special knowledge of stolen vehicles in the Presidio area. "We have said that 'reasonable suspicion' is to be determined by considering the totality of the circumstances, including the 'collective knowledge' of all officers in assessing the facts." *Shaw*, 701 F.2d at 377 n. 4 (citing *United States v. Kreimes*, 649 F.2d 1185, 1189 (5th Cir.1981)). The totality of the circumstances were not considered by the district court. The agents suspected that the appellees were driving stolen vehicles, not that they served as factota of illegal aliens. Accordingly, the proper inquiry, to which we now proceed, focuses on the bases for the suspicion the agents actually harbored.

■ The district court found that agent Wiemers' decision to stop the vehicle driven by Miranda-Perez was based upon the following facts: (1) two new vehicles were traveling together within several hundred yards of one another; (2) the vehicles were traveling southward towards Presidio; (3) the first vehicle did not have a front license plate; (4) he could only observe one occupant in each vehicle; (5) the vehicles were traveling at approximately 45 m.p.h.; (6) the vehicles' brake lights illuminated when he turned his patrol vehicle around to give chase; and (7) he had a personal belief that the vehicles were stolen.[4] We believe these facts are more than sufficient to raise a reasonable suspicion at the time of the stop that the vehicles were stolen and were being transported in interstate commerce.

We also note that which the district court failed to take into account: that agent Wiemers had been a border patrol agent in the Presidio border area for ten years; that through personal experience he learned that in almost all stolen vehicles cases the vehicles were new, only the driver occupied the vehicle, and the vehicles were ordinarily apprehended on Highway 67 between Presidio and Marfa. In addition, Wiemers was aware that most of the stolen vehicles were four-wheel drive vehicles. Ascribing this "collective knowledge" to the agents, we proceed to review the articulable facts that led to the vehicle stops.

Most significantly, the agents determined that neither vehicle had a front license plate and that both had a California rear license plate. The agents were also aware that the state of California requires that both front and rear license plates be displayed. This fact alone might be sufficient to raise a reasonable suspicion that the vehicles were stolen. *See United States v. Faulkner*, 488 F.2d 328, 330 (5th Cir.) ("The officers in the investigation of the crime of driving without a front license plate certainly had the right to ... make reasonable investigative inquiry about the ownership of the vehicle."), *cert. denied*, 417 U.S. 914, 94 S.Ct. 2614, 41 L.Ed.2d 218 (1974). We do not find reasonable suspicion on this fact alone, however, as the agents also were aware that the two ve-

---

4. We are required to accept these findings unless they are clearly erroneous, *United States v. Woods*, 560 F.2d 660, 663 (5th Cir.1977), *cert. denied*, 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 497 (1978). Our review of the record indicates that the findings are supported by the record. But, the testimony at the suppression hearing also makes clear that both vehicles, not just the first vehicle, lacked a front license plate and that both vehicles had California rear license plates. In addition, appellees indicate in their brief on appeal that "[n]either vehicle had a front license plate and each had a California plate."

hicles were driving in tandem.[5] *Cf. United States v. Barnard*, 553 F.2d 389, 392 (5th Cir.1977) ("Although observation of two cars in proximity on a sparsely traveled road does not itself justify a stop, it may understandably raise the officer's suspicions."). In addition, as the agents' car made a u-turn to follow the appellees' vehicles, the brake lights of both the Camaro and the Blazer illuminated.[6] This fact also could raise some suspicion in the minds of the border agents. *Cf. United States v. Frisbie*, 550 F.2d 335, 338 (5th Cir.1977).

Reasonable suspicion is also supported by the fact that the cars were spotted on Highway 67 between Presidio and Marfa, a highway on which stolen cars were usually found; that there was only one occupant in each vehicle; and that one vehicle was a four-wheel drive Blazer, a vehicle favored for interstate theft. Agent Wiemers was well aware that all of these facts indicated that the vehicles likely were stolen. In addition, before deciding to stop the Blazer, agent Wiemers also noticed that the vehicles' axles were relatively clean, leading him to believe that they were new. As most stolen vehicles in the border area were new vehicles, this fact lent further support to the agents' conclusion that the vehicles were stolen.

We conclude that while no single factor may support the conclusion that stopping the vehicles was supported by reasonable suspicion, taken together and as considered by the experienced border patrol agents, reasonable suspicion that the vehicles were stolen did exist so as to authorize the stop and further inquiry by the agents. Our conclusion is bolstered by the Supreme Court's recent decision in *United States v.*

*Sharpe,* — U.S. —, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). In *Sharpe,* an agent for the Drug Enforcement Administration stopped and searched an apparently overloaded pickup truck with an attached camper, traveling in tandem with a Pontiac. Before discussing the primary issue on appeal, the reasonableness of the investigative stop, the Court stated that the Court of Appeal's assumption "that the police had an articulable and reasonable suspicion that [the defendants] were engaged in marihuana trafficking ... is abundantly supported by the record." *Id.,* 105 S.Ct. at 1573. Supporting such a conclusion, the Court noted:

> Agent Cooke had observed the vehicles traveling in tandem for 20 miles in an area near the coast known to be frequented by drug traffickers. Cooke testified that pickup trucks with camper shells were often used to transport large quantities of marihuana.... Savage's pickup truck appeared to be heavily loaded, and the windows of the camper were covered with a quilted bed-sheet material rather than curtains. Finally, both vehicles took evasive actions and started speeding as soon as Officer Thrasher began following them in his marked car.... Perhaps none of these facts, standing alone, would give rise to a reasonable suspicion; but taken together as appraised by an experienced law enforcement officer, they provided clear justification to stop the vehicles and pursue a limited investigation.

*Id.* at 1573 n. 3. Similarly, taken together, the articulable facts before these two agents justified the stop of appellees' vehicles.[7]

---

**5.** The district court observed that agent Wiemers did not know the vehicles were traveling in tandem; however, nothing in the record appears to support such an observation.

**6.** Notwithstanding evidence that the terrain was hilly and that appellees may have applied their brakes in the course of driving cautiously, we conclude that some suspicion exists because the vehicles were not exceeding the speed limit and appellees slowed at the exact time the agents' marked vehicle turned to follow them.

**7.** As we conclude that the stop of both vehicles was supported by reasonable suspicion, we do not decide whether facts garnered by the agents during their conversation with Rojas-Fuentes permissibly could lend further support or justification for the later stop of Miranda-Perez. Sufficient facts existed at the time to support an investigative stop of either vehicle.

The order granting defendants' motion to suppress evidence is VACATED and this case is REMANDED for further proceedings.