UNITED STATES of America,
Plaintiff–Appellee,

v.

Dennis Mark KOHLER,
Defendant–Appellant.

No. 87–1080.

United States Court of Appeals,
Fifth Circuit.

Jan. 21, 1988.

Gerald H. Goldstein, Ralph A. Lopez, Goldstein, Goldstein & Hilley, San Antonio,

Tex., Martin Underwood, Comstock, Tex., for defendant-appellant.

LeRoy Morgan Jahn, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before THORNBERRY, POLITZ, and JOLLY, Circuit Judges.

POLITZ, Circuit Judge:

Convicted of possession of marihuana with intent to distribute, 21 U.S.C. § 841(a)(1), Dennis Mark Kohler appeals his conditional guilty plea, Fed.R.Crim.P. 11(a)(2), contending that the court erred in denying his motion to suppress evidence discovered during the search of his motor home and his simultaneous inculpatory statements. Finding no error, we affirm.

*Background*

The pertinent factual scenario begins on the parking lot of the Rio Grande Village Store, within 200 yards of the Mexican border, in Big Bend National Park, Texas, on Sunday morning, September 21, 1986, the day before Kohler's arrest. Dee Ericks, a park ranger, noted two motor homes parked on the store parking lot. Recreational vehicles were not allowed to park on that lot but were restricted to a special lot prepared for their use.

Ericks spoke separately with the occupants of the two motor homes, a Honey occupied solely by Kohler, and a Tioga occupied by a couple. She collected the $4.00 park camping fee from each. There was no indication that the two drivers were acquainted. Indeed the driver of the Tioga told her he had only parked on the store lot because he saw the Honey parked there. When told that they had to register and pay a site-use fee to the proprietors of the store, Helen and Bob Storm, the drivers did so, each signing for two nights. Kohler was assigned to site 16; the blond-haired driver of the Tioga, identified as Tim McGonigel, was alloted site 10.

During the first contact with Ranger Ericks, Kohler was relaxed, friendly, and open. His motor home was also open and the windows were uncovered. During the course of the day, Kohler purchased material to fashion shades, or covers, for the windows. Mrs. Storm helped cut the material to size.

On that Sunday afternoon, a blue pickup truck towing a trailer loaded with a powered pontoon boat drove to site 10. Bob Storm walked over to handle site registration for the pickup, only to be told by an otherwise unidentified dark-haired man that he was the owner of the Tioga which McGonigel had registered and that he would be leaving shortly. The Storms later saw the pickup and boat at a nearby boat ramp.

The store usually closed at 6:00 p.m. Just prior to that time, the dark-haired man came in to shop for groceries. He did so quickly, bought gas, and secured change for use of the telephone located just outside of the store. At about that time Ranger Ericks returned to the store. She saw the dark-haired man hang up the telephone, walk quickly to the Tioga, and drive off in a reckless manner, running a stop sign and nearly striking another vehicle.

Ericks then spoke with the Storms, who related the incident involving the pickup and the uncertainty whether the pickup and the Tioga would stay the night. The Storms then departed, traveling north. They observed the Honey and the Tioga together on an overlook which provided a view of the entire area.

The Storms returned to the store around 9:00 p.m. that night in time to see the Tioga, pickup, trailer, and boat leaving the campground. Kohler was in site 10. When the Storms asked for an explanation of the site change, Kohler told them that site 16 had been occupied when he returned and that he had pulled into site 10 because it was rented to a friend who had gone rafting.

When Ranger Ericks began her tour of duty the following morning the Storms gave her a written account of their encounters the previous day with Kohler, McGoni-

gel, and the dark-haired man, and the movements of the two motor homes and the pickup. Shortly thereafter Ericks met Kohler in the store. Their discussion was relaxed and low-key. Kohler asked about a mechanic to check the alternator on his motor home. He also inquired about the most direct route to Alpine, Texas, and the frequency of the ranger patrols in the area. He also asked Ericks about her duty hours. He then walked back to the nearby campgrounds.

Within minutes, Ericks drove to Kohler's motor home to speak further with him about his friend in the Tioga. She found the motor home closed with all windows covered. The rear barely cleared the ground, evidencing a heavy load. On all prior occasions the Honey had been level, with no indication of any tilt, anathema for the proper functioning of motor home appliances, and a telling indication of weighty contents. As the appearance of the motor home had changed dramatically, so had Kohler's attitude and demeanor. Contrary to his actions at the store a few minutes earlier, he was now secretive, agitated, and nervous. He became visibly disturbed when Ericks inquired about the dark-haired man in the Tioga.

Ericks determined to check Kohler more closely, asking for his driver's license and vehicle registration. When Kohler said the Honey was rented, Ericks asked to see the rental contract. Kohler bypassed the door next to him and made entry through the other side of the motor home. Ericks requested permission to enter the motor home to check the odometer reading against that listed on the El Paso agency rental contract. Kohler declined. Ericks then indicated that Kohler's conduct and that of the Tioga and pickup truck drivers were troublesome and that the park rangers and border patrol agents were particularly conscious of the use of the area for the smuggling of aliens and contraband. At this point Kohler became noticeably distressed and he stammered a statement that he needed a mechanic for his engine. Ericks then withdrew and contacted her superiors.

Ericks related the foregoing to Border Patrol Agent Guillermo Morales, Jr., who viewed the motor home and confirmed that its configuration indicated a heavy load. Morales knew that within the prior year a rented motor home had been loaded in the immediate area with 47 undocumented aliens.

At approximately 11:00 a.m., September 22, 1986, Ranger Ericks observed the Honey departing with all doors and windows closed and covered. She followed. The rear was riding very low, and the motor home slowed and labored on every grade elevation. Ericks relayed this information to her headquarters at Panther Junction.

When the Kohler motor home reached Panther Junction, two border patrol agents dressed in plain clothes and traveling in an unmarked car began following. They maintained a trailing distance of a half mile or more. Three uniformed rangers in a marked vehicle brought up the rear. About three miles out of Panther Junction, Kohler pulled off the road to check his engine. The agents in the unmarked auto pulled in behind the motor home. The uniformed agents stopped further back and began to control traffic. They turned on their overhead lights and one cradled a rifle.

After observing the motor home for a brief period, one agent approached, knocked on the side door, and identified himself as a border patrol agent. Kohler opened the door. The agent immediately smelled the distinctive odor of marihuana and requested access. Kohler responded affirmatively and stepped out of the motor home. The agent entered and found over one and one-half tons of marihuana at the rear of the vehicle, stacked in bales from the floor to the ceiling. Kohler was arrested and *Miranda* warnings were given. He then made inculpatory statements, including the details of his involvement. He also spoke of his financial difficulties which he had hoped to ameliorate by this venture.

The district court declined to suppress either the marihuana or Kohler's statements, finding that the agents had sufficient reason to stop the motor home. The

trial judge found that the agents acted pursuant to articulable and objective facts. In assessing the matter, the trial court considered the foregoing factual scenario in light of the long experience of the agents in the handling of smuggling in this area of Texas. The two officers had arrested many smugglers and had seized many loads of both drugs and undocumented aliens. They were fully familiar with the methods of operation and the use of recreational vehicles. They knew of the propensity of smugglers to make access to the United States in that area, and they were aware that marihuana movements increased in the fall, after the seasonal harvest in Mexico. Viewing the totality of the circumstances, the trial court concluded that the action of the agents were based upon reasonable suspicion.

### Analysis

Kohler maintains on appeal that there was insufficient reasonable suspicion to support the stop and subsequent search. He recognizes that we must accept all factual findings unless they are shown to be clearly erroneous. *United States v. Juarez*, 573 F.2d 267 (5th Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978); *United States v. Griffin*, 555 F.2d 1323 (5th Cir.1977).

■ Kohler correctly notes that the fourth amendment applies to the seizure of persons, including seizures inherent in brief investigatory stops. He misperceives, however, the controlling rubrics.

We are persuaded that the stop occurred when the agent dressed in plain clothes knocked on the door and identified himself as a border patrol officer. We are to assess the total circumstances as of that moment. What did the officers then know? Of what were they reasonably suspicious?

■ Reasonable suspicion is to be determined by considering the totality of the circumstances, including the "collective knowledge" of all officers in assessing the

facts. *United States v. Miranda–Perez*, 764 F.2d 285 (5th Cir.1985) (*citing United States v. Shaw*, 701 F.2d 367, 377 n. 4 (5th Cir.1983), *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984)). This test was first articulated by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which teaches that in order for a stop to be justified "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21, 88 S.Ct. at 1880.

The Court applied the *Terry* test to the stop of a vehicle near the border in *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), noting that "[a]ny number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area," and listing some illustrative considerations.[1]

■ We found the *Brignoni–Ponce* factors applicable to the transportation of contraband in border areas in *Miranda–Perez*. Applying those factors to the case at bar results inexorably in the conclusion that the officers had a reasonable suspicion when they stopped the Kohler motor home. We note only the most obvious: the actions of the three men the day before; the presence of a type of boat infrequently seen in the area; the proximity to the border; the characteristics of the area; the history of the area for smuggling; the marked transformation of the motor home from an open, trim vehicle one day to a closed, loaded vehicle the next; the change in Kohler's demeanor, including his strained and agitated attitude after the appearance of the motor home had changed; the vehicle's laboring to climb the hills; and the newly installed window coverings.

■ While any single factor in isolation would be insufficient to support the stop, we consider the reasonableness of the offi-

---

1. In *Brignoni–Ponce* the Court spoke, *inter alia*, of characteristics of the area; proximity to the border; usual patterns of traffic; previous experiences with criminal traffic; recent criminal activity; the driver's behavior; type of vehicle; appearance of the vehicle—whether apparently heavily-loaded; all considered in light of the experience of the officers.

cers' suspicion under "the totality of the particular circumstances," *Brignoni-Ponce*, 422 U.S. at 885 n. 10, 95 S.Ct. at 2582 n. 10. Under this standard, we are persuaded that the district court correctly concluded that the officers acted legally and appropriately when they stopped Kohler. When the officer smelled the marihuana, he had not only the right but the duty to conduct a search for the contraband. *United States v. Villarreal*, 565 F.2d 932 (5th Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978); *United States v. Barnard*, 553 F.2d 389 (5th Cir. 1977); *United States v. Andrade*, 545 F.2d 1032 (5th Cir.1977). There was no error.

The conviction is AFFIRMED.