900 F.2d 260
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Edward NAPIOR, Defendant-Appellant.
 No. 89-2028.
 United States Court of Appeals, Sixth Circuit.
 April 16, 1990.
 
 Before DAVID A. NELSON and ALAN E. NORRIS, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This is an appeal by defendant Robert Napior from a conviction and sentence for manufacturing marijuana. Mr. Napior makes four claims: (1) that the police seized and questioned him without any reasonable and articulable suspicion; (2) that although he waived his Fifth Amendment rights as to questions about an offense he had not committed, there was no knowing and voluntary waiver as to questions about the offense he did commit; (3) that the application of Sentencing Guidelines violated his due process rights; and (4) that the court and the prosecutor violated a plea agreement. We find no merit in any of these claims, and we shall affirm the judgment of the district court.
 
 
 2
 * On August 12, 1988, a car occupied by defendant Napior and his co-defendant, Stephen Tonkovich, caught fire on a rural Michigan road. A group of firemen led by Assistant Fire Chief Rod McGuire arrived on the scene first. Deputy Sheriff Rod Sadler arrived soon thereafter. When Sheriff Sadler arrived, Fire Chief McGuire told because there were fires both in the engine compartment and toward the back of the car. Sadler called for backup, and Deputy Sheriff Jerry Ackley arrived five minutes later.
 
 
 3
 Sadler told Ackley of the suspicions about the fire. According to Sadler, Ackley was skeptical that the fire could have been arson. Nevertheless, each of the occupants was interviewed by a sheriff. Sheriff Ackley, who interrogated defendant Napior, said that he was going to ask him some questions about the car fire and advised him of his Miranda rights. See Miranda v. Arizona, 384 U.S. 436 (1966). Mr. Napior signed a waiver. After 15 to 20 minutes of questioning, the two deputies compared Tonkovich's and Napior's stories. They then searched a ditch along the road by the car and discovered some maps of the county, clothes, and a bag of fertilizer. Some of the maps were marked with X's at locations which Ackley knew were swampy and unpopulated.
 
 
 4
 About five minutes after the first interview, Sheriff Ackley returned to his car to ask defendant Napior more questions. The district court found that the sheriff did not remind Mr. Napior of his Miranda rights, but Napior admitted he remembered them. Mr. Napior answered questions posed by Sheriff Ackley about the maps and about marijuana production. Napior denied any involvement with marijuana. He admitted that the maps belonged to him, but claimed that he was a contractor and that the marks indicated places where he had done masonry or other work. This interview lasted about five minutes.
 
 
 5
 Sheriff Sadler then drove Messrs. Napior and Tonkovich to a nearby town so they could arrange for a ride. Sheriff Ackley remained on the scene and conducted a search that soon led to discovery of a number of marijuana plants growing some distance from the road. Ackley then radioed Sadler and told him to return Napior and Tonkovich. When the men got back, Sheriff Ackley reminded defendant Napior of his Miranda rights and tried to question him again. Napior refused to answer any further questions regarding the marijuana.
 
 
 6
 Mr. Napior was charged in three counts with conspiracy to manufacture marijuana, manufacturing marijuana, and possession of marijuana with intent to manufacture it. He moved to suppress all of the evidence discovered after he was questioned about the maps. After a hearing, the district court denied the motion. Pursuant to a plea bargain, Mr. Napior subsequently pleaded guilty to one count of manufacturing marijuana in violation of 21 U.S.C. Sec. 841(a)(1). He was sentenced to 74 months in prison.
 
 II
 
 7
 In contesting his seizure, Mr. Napior makes a two-part argument. First, he argues that the police made a Terry -stop without adequate cause. See Terry v. Ohio, 392 U.S. 1 (1968). Second, he contends that even if the stop was proper, the scope of the interrogation conducted during the stop was too broad.
 
 
 8
 * "[A] policeman may stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 109 S.Ct. 1581, 1585 (1989), quoting Terry 392 U.S. at 30. A number of facts support the conclusion that a reasonable suspicion existed in the case at bar. Sheriffs Ackley and Sadler, whose knowledge may be taken collectively, see United States v. Poulos, 895 F.2d 1113, ---- n. 6 (6th Cir.1990),[1] knew that: (1) the burning vehicle did not belong to Mr. Napior; (2) either the gas cap or the license plate was missing; (3) Mr. Tonkovich had told Fire Chief McGuire that the firefighters could "have this car"; (4) there were two separate burn patterns on the car; (5) Chief McGuire thought the fire was suspicious. In evaluating the validity of a stop, we must consider the totality of the circumstances. Rose, 889 F.2d at 1495, citing United States v. Cortez, 449 U.S. 411 (1981). In toto, it seems to us, the facts presented here form the basis for a reasonable and articulable suspicion of wrongdoing.
 
 B
 
 9
 Terry -stops must be "reasonably related in scope to the justification for their initiation." United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975), 392 U.S. at 29. There are a number of facts which, taken together, justify Sheriff Ackley's question about marijuana--a question, it will be recalled, that was not posed until after the discovery of the bag of fertilizer:
 
 
 10
 1. Napior and Tonkovich were residents of Detroit, which was nearly one hundred miles away;
 
 
 11
 2. The burning car and its occupants were on a minor road in a rural area;
 
 
 12
 3. A quick search of a nearby ditch in which Napior and Tonkovich had been walking revealed clothing, fertilizer and marked maps;
 
 
 13
 4. Ackley had personal knowledge that the highlighted areas on the Eaton County maps were suitable for growing marijuana;
 
 
 14
 5. Napior was carrying a large amount of cash; and
 
 
 15
 6. Napior gave "not convincing" responses to questions about the maps and their markings.
 
 
 16
 In attempting to refute these grounds for suspicion, Mr. Napior relies primarily on Sheriff Ackley's testimony that his question about growing marijuana was "just out of the blue." Mr. Napior does not deny, however, that Ackley had personal knowledge that the marks on the map indicated swampy, unpopulated areas suitable for growing marijuana. He does not deny that there was no apparent reason, other than an illicit one, why he was present in rural Eaton County. Although he denied that the fertilizer was his, he does not deny that it was present or that fertilizer is normally more useful in agricultural pursuits than in "masonry" or other construction work. We do not know exactly what Sheriff Ackley meant in saying that his question was "out of the blue," but the justification for the question seems perfectly obvious.
 
 III
 
 17
 Mr. Napior admits that he was properly warned of his Miranda rights before being questioned, and he admits that he voluntarily signed a written waiver form acknowledging "I also understand that any statements that I might make or any answers that I might give to questions can and will be used against me in court." He argues, however, that Sheriff Ackley affirmatively limited the scope of the questioning and of the waiver by saying that he was going to question Mr. Napior about a suspected arson.
 
 
 18
 Colorado v. Spring, 479 U.S. 564 (1987), left open the question of whether a waiver of Miranda rights would be valid in the face of "an affirmative misrepresentation by law enforcement officials as to the scope of the interrogation." Mr. Napior disclaims any suggestion that Sheriff Ackley misrepresented the scope of the questioning, but argues that he limited the scope of the questioning. We do not read Spring, however, as suggesting that what Sheriff Ackley did deprived Mr. Napior of his rights under the Fifth Amendment. The Spring Court noted that:
 
 
 19
 "In this case there is no allegation that Spring failed to understand the basic privilege guaranteed by the Fifth Amendment. Nor is there any allegation that he misunderstood the consequences of speaking freely to the law enforcement officials." Id. at 575.
 
 This being the case, the Court concluded:
 
 20
 "We hold that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." Id. at 577.
 
 
 21
 Napior acknowledged in writing that "any" statements he made could be used against him. Absent actual misrepresentation as to the scope of the questioning, the waiver is unquestionably valid.
 
 IV
 
 22
 In challenging the application of the Sentencing Guidelines, Napior claims he was denied his due process rights by the use of hearsay (out-of-court statements by co-defendant Tonkovich) and by not being accorded a hearing on the number of marijuana plants he grew. (The offense level turned on the number of plants.)
 
 
 23
 Hearsay evidence may be considered at the sentencing stage as long as the defendant has an opportunity to refute it and as long as the evidence bears "some minimal indicia of reliability in respect of defendant's right to due process." United States v. Robinson, --- F.2d ----, No. 88-4020, slip op. at 8 (6th Cir. March 13, 1990). Tonkovich's statements meet this standard.
 
 
 24
 The district court did not deny Mr. Napior the opportunity to present evidence on the number of marijuana plants he grew. He chose not to take the stand because he did not want to be questioned about plantings in prior years. We see no due process problem here; whether there was a breach of the plea agreement is a different issue, of course.
 
 V
 
 25
 Mr. Napior argues that his plea bargain was violated in three ways: (1) he was foreclosed from showing the probation officer how many marijuana plants were grown; (2) he was denied a reduction for acceptance of responsibility; and (3) he was threatened with adverse use of information regarding marijuana grown in previous years.
 
 
 26
 The first two claims are based on incorrect facts. The probation officer mistakenly took the indictment's statement on the number of plants as binding upon her, but she corrected her mistake in a revised sentencing report. And the presentencing report included a two-point reduction for acceptance of responsibility, as did the calculations at the sentencing hearing.
 
 
 27
 Neither was there any breach of the plea bargain insofar as prior years' plantings were concerned. Mr. Napior did not, as he claims, "bargain for the right to be able to testify to his quantity contentions without having to fear that his answers to questions about his prior years plantings would be used as a basis for increasing his sentence." Section Sec. 1B1.8 of the sentencing guidelines provides that:
 
 
 28
 "(a) Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and the government agrees that self-incriminating information so provided will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement."
 
 
 29
 This section applies only to out-of-court statements. See, e.g., United States Newsome, 894 F.2d 852, 855 (6th Cir.1990); United States v. Shorteeth, 887 F.2d 253, 256-57 (10th Cir.1989). Mr. Napior acknowledged when he pleaded guilty that the written agreement constituted "the entire agreement," and during plea discussions it was stated only that Napior's statements to the probation officer regarding his plantings in prior years would not be used against him.
 
 
 30
 Those statements were not used to increase his sentence. During negotiations Napior stipulated to a base level of 28 (adjusted to 26 for the acceptance of responsibility), but only "if legally the Court is allowed to consider prior years." Because Napior does not now deny that the court could consider the prosecution's independent evidence of such plantings, we find no error in the district court's reliance upon the stipulation. The sentence was within the guideline range to which Mr. Napior agreed.
 
 
 31
 The judgment and sentence of the district court are AFFIRMED.
 
 
 
 [1]
 Napior's argument that the collective knowledge doctrine does not apply to Terry -stops is not persuasive. In evaluating a Terry -stop, the Fifth Circuit has held that " 'reasonable suspicion' is to be determined by considering the totality of the circumstances, including the 'collective knowledge' of all officers in assessing the facts." United States v. Miranda-Perez, 764 F.2d 285, 289 (5th Cir.1985). In Hensley v. United States, 713 F.2d 220 (6th Cir.1983), rev'd on other grounds, 469 U.S. 221 (1985), we noted the general rule that probable cause could be based on "the collective knowledge of police officers who were directly involved in the investigations that prompted the various arrests," 713 F.2d at 223 (citations omitted), but we refused in the context of a Terry -stop to extend the rule to officers not directly involved. The Supreme Court did not object to our statement of the general rule, or to its application to Terry -stops, but held that in some situations the knowledge of officers not involved in the stop may establish a reasonable suspicion. 469 U.S. at 232. Because both Sadler and Ackley were directly involved in this investigation at the scene of the car fire, that holding is not relevant here