UNITED STATES of America,
Plaintiff–Appellee,

v.

Roberto Luis LOPEZ,
Defendant–Appellant.

No. 89–2598.

United States Court of Appeals,
Fifth Circuit.

Aug. 29, 1990.

Gustavo Acevedo, Laredo, Tex., for defendant-appellant.

James L. Turner, Paula Offenhauser, Asst. U.S. Attys., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before RUBIN, POLITZ, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

Roberto Luis Lopez (Lopez) appeals his conviction of possession with intent to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and 18 U.S.C. § 2, contending that the district court erred in not suppressing the marijuana found in his truck as fruit of an illegal stop under the fourth amendment. Finding no error, we AFFIRM.

## I.

The following facts were developed at the hearing on Lopez's motion to suppress, at which Lopez testified only about whether he consented to the search of his truck.

On November 1, 1988, at approximately 6:30 a.m., United States Border Patrol Agent Robert Molina (Molina) and his supervisor were working inside a trailer at a stationary checkpoint located at the intersection of two highways, thirty-five miles east of Laredo, Texas. As Molina started monitoring citizens band (CB) radio transmissions, he overheard a transmission which indicated that "[s]omebody was observing [Molina and his supervisor] rather closely." Molina was alarmed and looked for approaching vehicles; he thought that someone was preparing to attack them. He observed a gray pickup truck approaching slowly from the south. He then heard the voice on the CB order someone to "go ahead and come on through quick before they [the Border Patrol agents] come out" of the checkpoint trailer. Molina testified "that's when the [gray] vehicle accelerated and didn't even bother to stop at the [nearby] stop sign."

The gray truck stopped at the checkpoint, and Molina's supervisor conducted an immigration check on the truck's occupants. As the truck was departing, Molina "observed the driver pick up the C.B. and advise the other party ... that he had already made it through the checkpoint and was coming through." "[A]t the same time," that Molina was able to hear the

driver speak into the CB (because of Molina's close proximity at the door of the trailer), Molina also heard the "transmission ['I'm coming through'] come across the C.B. ...." Molina identified the voice as the one he had earlier heard monitoring the agents' activities at the checkpoint and was able to identify this voice as having the call name "Catfish" and the other voice as having the call name "Diamond Back." [1]

Molina advised his checkpoint backup unit, Border Patrol Agents Carter and Aguirre, who were out of their vehicle and inspecting railroad tracks in Oilton, approximately a mile and one-half from the checkpoint, to be on the lookout for a gray pickup truck. Molina could also hear CB transmissions indicating that Aguirre and Carter were also being observed; a third voice, which Molina had not heard before, stated: "We can see the other patrol cars and the two guys are out of the car at the tracks." Carter and Aguirre were unable to hear the CB transmissions because their patrol car was not equipped with a CB.

Aguirre and Carter got back in their vehicle and departed. While observing traffic approximately 15 minutes later, they saw a "blue pickup go by, a white pickup go by, [and] two other vehicles." Aguirre pulled up to the road and the gray pickup drove by, "coming from the checkpoint." Aguirre testified that "we turned around behind [the gray truck, and] Molina immediately called us back on the radio and he said ... the guy on the CB just said, 'Okay'. He turned around behind you ... keep on going." Molina then heard Catfish (gray pickup) transmit "[t]hey're [Aguirre and Carter] coming out from the road.... Everybody go, go, go."

Molina testified that Catfish (gray pickup) "indicated that he needed gas," and that Diamond Back (white pickup) responded that they could "either gas up in Oilton or go ahead and wait until further on the road." Molina testified "that's when the third voice came in and said, 'we'll just go

---

**1.** At the suppression hearing, Molina identified Catfish as the driver of a gray pickup truck, and Diamond Back as the driver of a white pickup

truck. Both were charged in the indictment which charged Lopez.

ahead and gas up in Bruni.'" As a result, Molina advised Aguirre to "look for vehicles stopping at gas stations ... in Bruni." When Carter and Aguirre drove into Bruni, they observed a white pickup truck at one service station and a blue pickup truck at another. These were the vehicles they had observed earlier, coming from the direction of the checkpoint. Carter and Aguirre proceeded to a lot approximately one mile from town and waited.

Shortly thereafter, the white pickup truck pulled into the lot. Carter and Aguirre decided to locate the other two (gray and blue) pickup trucks and had driven approximately three hundred yards when they spotted the blue truck heading in their direction. As the border patrol vehicle approached, the blue pickup decelerated noticeably. Aguirre noticed that the truck bed was covered with plywood and that the truck was "riding real low." Aguirre then passed by the blue pickup and saw that the gray truck was following it. Aguirre passed the gray pickup and after approximately one mile, turned around. Aguirre then saw the gray truck followed by the white truck heading back toward him. Aguirre testified that "my partner and I ... sat there and thought, hey, these guys are just the lookouts, or scouting. The load is probably in the blue pickup."

Aguirre then stopped the blue truck and testified that he did so because of "the whole scenario." He questioned the driver, defendant Lopez, about his nationality and what he was carrying in his truck. Aguirre testified that he asked Lopez twice if he could search the vehicle and that Lopez consented both times. After dropping the truck's tailgate and finding bundles of what appeared to be marijuana wrapped in plastic, the agents arrested Lopez.

Lopez was indicted on two counts: (1) conspiring to possess with intent to distribute marijuana; and (2) possessing marijuana with intent to distribute a quantity in excess of 100 kilograms (specifically, approximately 1,041 pounds). Before trial, Lopez moved to suppress the evidence. After a hearing, the district court denied the motion. At trial, the jury found Lopez guilty on count two but could not reach a verdict on count one, which was dismissed.

The district court sentenced Lopez to 97 months imprisonment and imposed a $15,-000 fine and a special assessment of $50. The court also ordered a five-year term of supervised release. Lopez timely appealed.

## II.

Lopez contends that the district court erred in not granting his motion to suppress. He appears to include within this issue the contention that he did not consent to the search of his truck.[2]

 As noted, Lopez testified at the suppression hearing, but limited his testimony to the consent issue. At the conclusion of the hearing, the district court ruled that "there was ample probable cause to stop the vehicle and consent to search." In reviewing the district court's denial of a motion to suppress, its "purely factual findings must be accepted unless clearly erroneous, or influenced by an incorrect view of the law." *United States v. Muniz–Melchor*, 894 F.2d 1430, 1433–34 (5th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 1957, 109 L.Ed.2d 319 (1990) (quoting *United States v. Maldonado*, 735 F.2d 809, 814 (5th Cir.1984)). And, the evidence is viewed in the light most favorable to the prevailing party. *United States v. Reed*, 882 F.2d 147, 149 (5th Cir.1989); *United States v. Lanford*, 838 F.2d 1351, 1354 (5th Cir.1988).

### A.

Lopez argues that the stop violated his fourth amendment rights, asserting that it was made "strictly on a hunch" and "without any probable cause or any articulable facts giving rise to a reasonable suspicion." Although the fourth amendment generally requires that probable cause exist for

---

**2.** The second issue in the motion (consent), while arguably not properly raised on appeal, is addressed in part II.B.

searches and seizures, the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), carved out the "reasonable suspicion" exception to this requirement. As caselaw amply demonstrates, this exception is well founded for vehicles in border areas. The district court held that there was probable cause to stop the vehicle; but it is not necessary to reach that issue, because obviously, a reasonable suspicion to stop the vehicle was subsumed within that holding.

■ A border patrol agent conducting a roving patrol in a border area may make a temporary investigative stop of a vehicle if aware of "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the vehicle is engaged in illegal activities. *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch" '." *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883).

■ In assessing reasonable suspicion, a court is to examine "the totality of the circumstances, including the 'collective knowledge' of all officers." *United States v. Muniz–Ortega*, 858 F.2d 258, 260 (5th Cir.1988) (citing *United States v. Kohler*, 836 F.2d 885, 888 (5th Cir.1988)) (citations omitted). Some of the factors that can be considered include the characteristics of the area, the proximity to the border, traffic patterns, the agent's previous experience with criminal traffic, the type and appearance of the vehicle, and the driver's behavior. *Brignoni–Ponce*, 422 U.S. at 884–85, 95 S.Ct. at 2581–82. "While any single factor in isolation would be insufficient to support the stop, we consider the reasonableness of the officers' suspicion under the 'totality of the particular circumstances'." *Kohler*, 836 F.2d at 888–89 (citing *Brignoni–Ponce*, 422 U.S. at 885 n. 10, 95 S.Ct. at 2582 n. 10).

■ Lopez contends that there was nothing in the CB transmissions or Aguirre's subsequent surveillance to warrant suspicion of his truck. This assertion is totally without merit. The CB transmissions identified that the individuals involved would be stopping for gas in Bruni, where Aguirre noticed Lopez's blue truck doing so. Both Molina and Aguirre believed that there were three vehicles working in tandem. The belief that the vehicles were traveling in tandem, lead car-load car arrangement, is a circumstance that "may understandably raise the officer's suspicions." *United States v. Barnard*, 553 F.2d 389, 392 (5th Cir.1977). Aguirre's belief was based on his observation of the three trucks and the blue truck's deceleration when it approached his patrol car. Obviously, "[a] trained officer draws inferences and makes deductions ... that might well elude an untrained person." *United States v. Reed*, 882 F.2d 147, 149 (5th Cir.1989) (quoting *United States v. Cortez*, 449 U.S. 411, 417–19, 101 S.Ct. 690, 694–96, 66 L.Ed.2d 621 (1981)).

"[R]easonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, — U.S. —, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). In *White*, which did not involve a less intrusive border area investigatory stop, the Court upheld an investigatory stop of a vehicle based on an anonymous tip that "had been sufficiently corroborated to furnish reasonable suspicion." *Id.* 110 S.Ct. at 2416. Here, the information received over the CB was corroborated by the subsequent surveillance of the trucks. Lopez's stop did not involve the "kind of standardless and unconstrained discretion [which] is the evil the Court" has associated with certain random stops. *See Michigan Dept. of State Police v. Sitz*, — U.S. —, 110 S.Ct. 2481, 2487, 110 L.Ed.2d 412 (1990) (quoting *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979)) (Court upheld a sobriety checkpoint which was not near the border).

The collective facts known to the agents were more than sufficient to support the stop. The evident load on Lopez's truck,

his conduct in decelerating as the agents approached, the intercepted CB transmissions, and the belief that Lopez's truck was the load vehicle while the other two trucks were scouts, gave the agents more than a reasonable, articulable suspicion that the vehicles were engaged in criminal activity. "The stop was based upon reasonable suspicion that criminal activity was afoot supported by specific articulable facts." *United States v. Fabregat*, 902 F.2d 331, 333 (5th Cir.1990).

### B.

Concerning the search, Agent Aguirre testified that he asked Lopez what he was carrying in the back of the truck and that Lopez responded "nothing." Aguirre testified that he then asked Lopez twice "do you mind if I look in the back [of the] truck"; and that both times Lopez answered "[s]ure, go ahead." Lopez, however, testified that "I did not tell [the agent] he could search my truck...." He testified that he was "ignoring the man [who asked for permission to search]" and that his affirmative answer was in response to a question from the other agent about whether he was a United States citizen. On cross-examination, Lopez testified that the agent misunderstood him, but that he "didn't actually come out and say, don't open [the tailgate]."

Whether Lopez consented to the search was one of the two issues in his motion to suppress, and the district court found both that "there was ample probable cause to stop the vehicle and consent to search." However, it is unclear whether this consent issue was raised on appeal. At most, it was raised by implication. The point was not briefed.

As stated earlier, the district court's finding of consent may be overturned on appeal only if clearly erroneous. *United States v. Sutton*, 850 F.2d 1083, 1085 (5th Cir.1988); *United States v. Rodriguez*, 835 F.2d 1090, 1093 (5th Cir.1988). "Where the judge bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the judge had the opportunity

to observe the demeanor of the witnesses." *Sutton*, 850 F.2d at 1086. Among others, the judge was able to so observe Lopez.

A search by consent is a well-recognized exception to the usual warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 218–19, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973); *United States v. Davis*, 749 F.2d 292, 294 (5th Cir.1986). Such consent must be given voluntarily and not simply in acquiescence to a claim of lawful authority, *see Schneckloth*, 412 U.S. at 248, 93 S.Ct. at 2058; and a determination that consent was voluntarily given is a finding of fact to be made in light of all the circumstances. *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. at 2058–59; *United States v. Gonzalez–Basulto*, 898 F.2d 1011, 1012–13 (5th Cir.1990). Factors to aid this determination include:

(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Gonzalez–Basulto*, 898 F.2d at 1013 (quoting *United States v. Galberth*, 846 F.2d 983, 987 (5th Cir.), *cert. denied*, 488 U.S. 865, 109 S.Ct. 167, 102 L.Ed.2d 137 (1988)).

There is no proof that the agents brandished weapons or made threats to obtain Lopez's consent. After a preliminary, and brief, discussion, one agent simply asked twice for permission to look in the back of the truck. *See Gonzalez–Basulto*, 898 F.2d at 1013. Though he had been stopped, Lopez was not under any form of physical restraint, nor had he been subjected to any threats of force or intimidation; indeed, he had not yet been arrested, as that only occurred after the agents found the marijuana under the plywood. *Id.* Nor did an agent induce Lopez's consent through any form of deception. *Davis*, 749 F.2d at 297.

Lopez's response of "sure" when the agent asked if he could look in the truck could be viewed as indicative of coopera-

tion. *Gonzalez–Basulto,* 898 F.2d at 1012–13 (defendant cooperated with request; he responded "no problem" and opened the trailer doors). Although there was no testimony that Lopez was informed of his right to refuse consent, the lack of awareness of this right does not taint the voluntariness of consent. *United States v. Sutton,* 850 F.2d at 1085; *Davis,* 749 F.2d at 296.

However, Lopez did testify that he did not consent and that his response of "sure" was only to the immigration question from another agent. The agent testified that they asked Lopez twice, to ensure that he understood. Because Lopez did not express any concern or object to the agent's search, it was reasonable for the agent to believe that Lopez consented. *United States v. Villarreal,* 565 F.2d 932, 937 (5th Cir.), *cert. denied sub nom., Almand v. United States,* 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978).

In light of the foregoing factors, it cannot be said that the district court's finding that Lopez voluntarily consented to the search was clearly erroneous.

### III.

The district court's denial of the motion to suppress was correct. Accordingly, the judgment of conviction is

AFFIRMED.