IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-8660

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RITA ANN CARDENAS
and SHAMSIDEEN ABIODUN LAWAL,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Western District of Texas
_____

(December 9, 1993)

Before REYNALDO G. GARZA, KING and DeMOSS, Circuit Judges.

KING, Circuit Judge:

Rita Ann Cardenas (Cardenas) and Shamsideen Abiodun Lawal
(Lawal) were convicted in a non-jury trial of conspiracy to
import heroin into the United States from Mexico, in violation of
21 U.S.C. §§ 952(a), 960(a)(1), and 963 (Count One); conspiracy
to possess heroin with intent to distribute, in violation of 21
U.S.C. §§ 841(a)(1), 846 (Count Two); importation of heroin, in
violation of 21 U.S.C. §§ 952(a), 960(a)(1) (Count Three); and
possession of heroin with intent to distribute, in violation of
§ 841(a)(1) (Count Four). Cardenas was sentenced to 121 months
imprisonment on each count, to run concurrently, and a five-year

term of supervised release. She was also ordered to pay a special assessment of $200. Lawal was sentenced to 210 months imprisonment on each count, to run concurrently, and a five-year term of supervised release. He was also ordered to pay a special assessment of $200.

Each defendant appeals his or her conviction and sentence. We affirm the district court's judgment of conviction and sentence.

## I. BACKGROUND

### A. Factual Background

Shortly before noon on August 7, 1992, Quirino Paez-Guerrero, a taxi driver in Juarez, Mexico, picked up Cardenas and Lawal in front of the San Carlos Hotel in Juarez to take them across the border to El Paso, Texas. Following United States Customs procedures for transporting passengers across the border, Paez-Guerrero discharged his passengers in front of the pedestrian border checkpoint before proceeding through the vehicle checkpoint and waiting for them on the United States side of the border.

Immigration Inspector Robert Alvarado passed Cardenas through a pedestrian lane without detention after questioning her and reviewing her United States passport. Approximately five minutes later, Lawal attempted to pass through another pedestrian lane. Senior Customs Inspector Arnulfo Valdez asked Lawal several routine entrance questions to which Lawal responded with

"very evasive" answers.  Lawal presented Valdez with his resident alien card, which showed that he was a Nigerian citizen.  When Valdez then asked Lawal for his passport, airline tickets, and itinerary, Lawal replied that he had only been in Juarez for a day and that the requested items were in his hotel room in El Paso.  Throughout Valdez's questioning of Lawal, Lawal appeared very nervous and "showed symptoms of abnormal behavior."

Valdez then took Lawal to the Customs "Head House," the customs inspection area, approximately twenty yards from the pedestrian lanes.  In the waiting room, Valdez initiated a routine patdown search for weapons on Lawal.  Immigration Inspector Lorenzo Ramirez and Supervising Inspector Jose Soledad were nearby in the doorway.  Valdez discovered in Lawal's pockets an opened box of razor blades, $1044 in cash, part of a roll of transparent tape, and a key to Room 17 in the San Carlos Motel in Juarez.  He also discovered in Lawal's wallet a photograph of a woman later identified as Cardenas.  When Lawal attempted to grab the razor blades, inspectors had to subdue him.  Inspector Valdez testified that based on his past experience, the presence of the razor blades, as instruments commonly used in the cutting of heroin and cocaine, raised his suspicion that Lawal was involved in narcotics trafficking.

Valdez then initiated a strip search of Lawal.  When Lawal was removing his shoes, a passport fell out of his right shoe and onto the floor.  Lawal tried to prevent discovery of the passport by covering it with his foot; he dragged his feet with the

3

passport across the room so that the inspectors had to "kinda push him" away to recover the passport. The passport was a United States passport issued to Cardenas, which contained visa stamps for entry into the Philippines, a country the inspectors recognized as being "a high source country for narcotics." Recalling from experience that drug smugglers often travel in pairs and split up as they go through customs to avoid detection, Valdez discontinued the search of Lawal to brief Soledad, his supervisor, of his suspicions--i.e., that Lawal and Cardenas were partners in a smuggling scheme and that Cardenas had recently crossed the border and was somewhere nearby. Soledad and Inspector Frasas then initiated a search for Cardenas.

While the search for Cardenas was proceeding, the inspectors at the Head House continued their investigation of Lawal. A drug-sniffing dog alerted to the presence of narcotics on the cash discovered in Lawal's pocket.

Within approximately five minutes of initiating the search for Cardenas, Soledad spotted her next to a wall near a store, at most a block away from the border crossing. Soledad identified himself, and Cardenas, responding to Soledad's questions, confirmed that she was Cardenas. Soledad and Frasas then took Cardenas back to the Head House.

After Cardenas arrived at the Head House, Inspector Edna Hasan searched Cardenas' purse and found airline tickets and boarding passes, hotel receipts, Filipino and Dutch currency, and a United States passport in Cardenas' name. Cardenas appeared

4

unusually nervous throughout this search.  When Cardenas then asked what was wrong, she was informed that she was suspected of being a narcotics courier.  After Cardenas was told that carrying drugs internally was very dangerous, Cardenas began to cry and pointed to her waist, stating that she was carrying drugs "here."

Hasan and Inspector Sylvia Page then searched Cardenas and found five plastic transparent bags containing heroin.  These bags had been held in place around Cardenas' waist by a strong Lycra girdle and tape, the same kind of tape that Lawal was carrying.  Hasan stated that Cardenas would have required assistance to put into place and secure the heroin onto her body as it had been positioned and secured.[1]  Another bag of heroin was found in Cardenas' left sock.

The gross weight of the heroin found on Cardenas' person was 5.5 pounds.  Customs Special Agent Ricky Hearn testified that the heroin was of 87 percent purity and that heroin of this amount and purity was "distribution" heroin, not "user" heroin--which is of less than 10 percent purity.  Hearn also stated that the wholesale value of the heroin was more than "half a million dollars" and that once the heroin was cut up and had its purity percentage lowered, its value would significantly increase.

---

[1] Hasan assisted Cardenas in both taking the girdle and plastic bags off and securing everything back into place in order to take pictures.  The largest bag of heroin was secured under the girdle on Cardenas' back.

Cardenas was informed of her <u>Miranda</u>[2] rights and then signed a form indicating that she understood her rights and that she wished to waive them and make a statement.  Cardenas told the inspectors that she and Lawal were involved in a scheme to import narcotics into the United States.  She stated that a woman named "Lucy" from Houston offered her $15,000 to pick up some narcotics in the Philippines and bring them into the United States.  She said that after she had gone to the Philippines and received a quantity of drugs there from an unknown man, she traveled to Amsterdam, in the Netherlands, and then to Mexico City, where she first met Lawal in the airport.  She also explained that the picture of herself found in Lawal's wallet was a picture she had given to "Lucy" so that "Lucy" could give it--for identification purposes--to the person who was to meet Cardenas at the Mexico City airport.  Together, she said, she and Lawal went to the San Carlos Hotel in Juarez, where she stayed while Lawal went out to "buy some stuff."  She stated that he returned to the room with a girdle, razor blades, tape, and plastic baggies.  She explained that after Lawal had packaged the drugs into the baggies and secured the heroin in Cardenas' girdle, they exited the hotel, got into a taxi, and proceeded to the border crossing to enter into the United States.  She also stated that more drugs were in the hotel room in Juarez.

After being informed of his <u>Miranda</u> rights, Lawal told inspectors that he had found Cardenas' passport on the ground

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 479 (1966)

near the border crossing.  He stated that he was carrying it inside of his shoe to avoid being found with someone else's passport and that he intended to turn it in to authorities.  He first explained that he was traveling alone, but he stated later that his wife and infant son were waiting for him at the Holiday Inn Hotel in downtown El Paso.  Furthermore, he initially denied ever seeing Cardenas, but later admitted riding in the taxi with her from the hotel to the border crossing.  He also denied knowledge of either the presence of Cardenas' picture in his wallet or the heroin confiscated from Cardenas' person.

## B. Procedural History

On August 19, 1992, Lawal and Cardenas were indicted for conspiracy to import heroin into the United States from Mexico, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 963 (Count One); conspiracy to possess heroin with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846 (Count Two); importation of heroin, in violation of 21 U.S.C. §§ 952(a), 960(a)(1) (Count Three); and possession of heroin with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1).  Each defendant pleaded not guilty to all of the charges.

Cardenas then moved to suppress her confession and the drugs seized from her person on the ground that they were obtained as a result of an unlawful search and seizure.  Lawal also moved to suppress any evidence obtained from the search of his person or the hotel room in Juarez and to suppress statements he made after he was taken into custody on the same grounds.  At a suppression

7

hearing which began on October 19, 1992, the district court denied Cardenas' motion to suppress, reasoning that the search and seizure of Cardenas had been conducted pursuant to the extended border search doctrine as enunciated in United States v. Espinoza-Seanez, 862 F.2d 526 (5th Cir. 1988).  The court also denied Lawal's motion to suppress.  Neither Cardenas nor Lawal testified at the suppression hearing.

After the defendants waived their right to a jury trial, the district court held a bench trial on October 22, 1992, which commenced at the conclusion of the suppression hearing.  Neither defendant testified at trial, and the court admitted the evidence from the suppression hearing, including Cardenas' admission which she had sought to suppress.  Lawal objected to the inclusion of testimony relating to Cardenas' admission on the grounds that it violated his Sixth Amendment right to confront and cross-examine Cardenas and that it was inadmissible hearsay.  The district court overruled his objection.

Cardenas and Lawal were convicted of the offenses charged and sentenced to 121 months and 210 months imprisonment, respectively, on each count to run concurrently.  Each defendant was also sentenced to a five-year term of supervised release and ordered to pay a special assessment of $200.  Each defendant now appeals his conviction and sentence.

II. DEFENDANT CARDENAS

A. Standard of Review

Cardenas contends that the district court erred in dismissing her motion to suppress evidence obtained as a result of her search and seizure, which she alleges were made without probable cause and hence in violation of the Fourth Amendment. In reviewing a district court's denial of a motion to suppress, we review factfindings under the clearly erroneous standard. United States v. Ramirez, 963 F.2d 693, 704-05 (5th Cir.), cert. denied, 113 S. Ct. 388 (1992); United States v. Lopez, 911 F.2d 1006, 1008 (5th Cir. 1990). The district court's conclusions of law are reviewed de novo. United States v. Richardson, 943 F.2d 547, 549 (5th Cir. 1990). Furthermore, in reviewing a ruling on a motion to suppress, we view the evidence in the light most favorable to the party who prevailed in the district court. United States v. Piaget, 915 F.2d 138, 140 (5th Cir. 1991); United States v. Reed, 882 F.2d 147, 149 (5th Cir. 1989). We view not only the evidence taken at the suppression hearing, but also the evidence taken at trial. United States v. Rideau, 969 F.2d 1572, 1576 (5th Cir. 1992) (en banc).

## B. Cardenas' Argument on Appeal

Cardenas contends that the district court erred in denying her motion to suppress based on the court's erroneous conclusion that her search and seizure were constitutionally permissible under the extended border search doctrine. She argues specifically that the extended border search doctrine is inapplicable in her case because the doctrine applies only to searches of vehicles, not to searches of pedestrians, that have

9

crossed the international border.  She also argues that if the doctrine does apply, its requirements have not been met because several of the district court's critical factual findings concerning her search and seizure are not supported by the record.

We first review the rationale on which the extended border search doctrine is grounded and the requirements which must be met before a search can qualify as an extended border search.  We then address each of Cardenas' contentions in turn.

### 1. *The Extended Border Search Doctrine*

The Fourth Amendment to the United States Constitution provides in pertinent part that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . .

The Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions.  Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1977).  One important exception is the border search doctrine.  Under this doctrine, a governmental officer at the international border may conduct routine stops and searches without a warrant or probable cause because the United States as a sovereign state has the right to control what persons or property crosses its international borders.  See United States v. Ramsey, 431 U.S. 606, 616 (1977); United States v. Berisha, 925 F.2d 791, 793-94 (5th Cir. 1991); see also United States v.

10

Montoya de Hernandez, 473 U.S. 531, 538 (1985) ("[T]he Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior.").

The border search doctrine is also applicable to stops and searches conducted at the "functional equivalent" of the border, i.e., the first point at which an entrant may practically be detained. Almeida-Sanchez v. United States, 413 U.S. 266, 272 (1973). For example, the "functional equivalent" of the border has been found to be the airport where an international flight lands, see, e.g., United States v. Klein, 592 F.2d 909, 911 n.1 (5th Cir. 1979), or the port where a ship docks after arriving from a foreign country, see, e.g., United States v. Prince, 491 F.2d 655, 659 (5th Cir. 1974). A search at the "functional equivalent" of the border is justified under the border search doctrine because

> "it is in essence no different than a search conducted
> at the border; the reason for allowing such a search to
> take place other than at the actual physical border is
> the practical impossibility of requiring the subject
> searched to stop at the physical border."

United States v. Niver, 689 F.2d 520, 526 (5th Cir. 1982) (quoting United States v. Garcia, 672 F.2d 1349, 1363-64 (11th Cir. 1982)). Thus, a routine search made at the border or its functional equivalent may be made without probable cause or any suspicion to justify the search. United States v. Sandler, 644 F.2d 1163, 1167-69 (5th Cir. 1981) (en banc).[3]

---

[3] Although the Supreme Court has never determined what makes a border search "routine," lower courts have generally classified routine searches as those which do not seriously invade a

11

Further, the border search doctrine has been extended to allow government officials to conduct a warrantless search and seizure <u>beyond</u> the border or its functional equivalent on the "reasonable suspicion" of criminal activity.  See <u>Espinoza-Seanez</u>, 862 F.2d at 531; <u>United States v. Melendez-Gonzalez</u>, 727 F.2d 407, 410-11 (5th Cir. 1984).  "The main difference between the functional equivalent of the border search and an extended border search is that the latter takes place <u>after</u> the first point in time when the entity might have been stopped within the country."  <u>Niver</u>, 689 F.2d at 526.

An extended border search, however, entails a greater intrusion on an entrant's legitimate expectations of privacy than does a search conducted at the border or its functional equivalent.  See <u>id</u>.  Accordingly, this court has determined that three factors must be demonstrated before an extended border

---

traveler's privacy.  <u>See, e.g.</u>, <u>United States v. Jackson</u>, 825 F.2d 853, 857 (5th Cir. 1987) (search of vehicle), <u>cert. denied</u>, 484 U.S. 1011, <u>and cert. denied</u>, 484 U.S. 1019 (1988); <u>United States v. Fortna</u>, 796 F.2d 724, 738 (5th Cir.) (en banc) (search of luggage), <u>cert. denied</u>, 479 U.S. 950 (1986); <u>see also</u> <u>United States v. Johnson</u>, 991 F.2d 1287, 1291 (7th Cir. 1993) (search of border entrant's outer clothing, personal effects, purse, and wallet).  However, a stop and search that is not considered "routine" requires at least "reasonable suspicion" of wrongdoing to pass constitutional muster.  <u>See</u> <u>United States v. Montoya de Hernandez</u>, 473 U.S. 531, 538 (1985) (detention at the border, beyond the scope of a routine customs inspection, is justified if--after having considered all of the facts surrounding the traveler and his itinerary--the inspectors reasonably suspect that the traveler is smuggling contraband).  This "reasonable suspicion" standard has been applied to non-routine searches such as x-ray examinations, <u>see</u> <u>Montoya</u>, 473 U.S. at 541 n.4, and strip searches, <u>see</u> <u>United States v. Adekunle</u>, 980 F.2d 985, 987-88 (5th Cir. 1992), <u>cert. denied</u>, 113 S. Ct. 2380, <u>and cert. denied</u>, 113 S. Ct. 2455, <u>vacated in part on reh'g on other grounds</u>, 2 F.3d 559 (5th Cir. 1993).

search is deemed reasonable and hence constitutionally permissible: (1) a showing of a "reasonable certainty" or a "high degree of probability" that a border crossing has occurred; (2) a showing of a "reasonable certainty" that no change in the condition of the person or vehicle being inspected occurred from the time of the border crossing until the search and that the contraband found was present when the person or vehicle crossed the border; and (3) a showing of a "reasonable suspicion" that criminal activity was occurring. See Espinoza-Seanez, 862 F.2d at 531. This court has also determined that "reasonable certainty" is "a standard which requires more than probable cause, but less than proof beyond a reasonable doubt." Id.; United States v. Delgado, 810 F.2d 480, 484 (5th Cir. 1987); Niver, 689 F.2d at 526. Further, in determining whether there is a "reasonable suspicion" that criminal activity was occurring, each case "must turn on the totality of the particular circumstances." Espinoza-Seanez, 862 F.2d at 531.

2. *Applicability of the Extended Border Search Doctrine*

a. Vehicles or Persons

Cardenas first contends that the district court erred in applying the extended border search doctrine in her case. She argues that the justification for relaxing the warrant requirement under the extended border search doctrine is the mobility, speed, and capability for smuggling associated with vehicles. She thus concludes that the border search doctrine was

13

formulated to apply only to vehicles, not pedestrians, crossing the border.  We disagree.

Although reported cases concerning the extended border search doctrine involve the search of a vehicle, the doctrine was not formulated to apply only to vehicles that have crossed the border.  The major impetus behind the extended border search doctrine is "the government interest in stopping drug traffic." WILLIAM E. RINGEL, SEARCHES AND SEIZURES, ARRESTS AND CONFESSIONS § 15.3, at 15-20 (Supp. 1993); cf. United States v. Kenney, 601 F.2d 211, 212-13 & n.1 (5th Cir. 1979) (noting that subject to the requirements of the Fourth Amendment, 19 U.S.C. § 482 authorizes customs inspectors to stop and search at the border any vehicle or person suspected of bringing contraband into the country).  We explained the basic rationale for an extended border search in United States v. Richards, 638 F.2d 765, (5th Cir.), cert. denied, 454 U.S. 1097 (1981):

> While the mere fact that a person or thing has once crossed the border does not sanction a search of it forever after, we have also recognized that the need to protect personality and property against warrantless invasion must be balanced against the myriad difficulties facing customs and immigration officials who are charged with the enforcement of smuggling and immigration laws.  We have, therefore, recognized in the doctrine of "extended border search," the government's power, under certain circumstances, to search without a warrant persons and things after they have entered the country.

Id. at 771 (emphasis added); see also United States v. Flynn, 664 F.2d 1296, 1306 n.17 (5th Cir.) (explaining that an extended border search "enables government officials to search persons or goods at some point after they have crossed the border where

14

there is a reasonable suspicion of secreted contraband that can be shown to have been present at the time the border was crossed") (emphasis added), cert. denied, 456 U.S. 930 (1982); United States v. Sheikh, 654 F.2d 1057, 1070 n.16 (5th Cir. 1981), cert. denied, 455 U.S. 991 (1982) (same). Thus, because both vehicles and persons crossing the border may harbor contraband, it follows that the extended border search doctrine should permit the search of not only vehicles but also persons-- the caveat being, however, that the requirements enunciated in Espinoza-Seanez must be met so that an entrant's legitimate expectations of privacy are not unconstitutionally intruded upon.[4] To view the extended border search doctrine in the limited manner which Cardenas prescribes would be to frustrate the purpose of the extended border search doctrine--as well as the border search doctrine itself on which the extended doctrine is based--so as to limit illogically the right of a sovereign state to control what persons or property crosses its international borders. We therefore find Cardenas' argument to be without merit.

b. The Requirements of *Espinoza-Seanez*

Cardenas contends generally that the district court based its determination that the Espinoza-Seanez factors had been

_____

[4] We note that an extended border search can properly be conceived as much like a search at the border or at the functional equivalent of the border because the entrant or the vehicle to be searched "'brings the border with it' to the point of the search." United States v. Johnson, 588 F.2d 147, 154 n.11 (5th Cir. 1979).

15

demonstrated on clearly erroneous factfindings, i.e., that the taxi driver gave a description of Cardenas' clothing to Inspector Soledad before Soledad set out to look for Cardenas, that Cardenas volunteered to walk with Soledad to the Head House, and that Cardenas told Soledad that she had just crossed the border. We find no support in the record for these particular findings. However, we consider the other findings made by the district court, which are supported by record evidence, in reviewing the district court's conclusion that the Espinoza-Seanez factors have been demonstrated.

(i). Reasonable certainty of a border crossing

Cardenas first contends that the government failed to show by a "reasonable certainty" or a "high degree of probability" that she had just crossed the border. She argues that she was not viewed with suspicion as she crossed the border, that she was not kept under surveillance after she crossed, and that nothing about her appearance or her being located within a block of the border when found supports a high degree of probability that she had just entered the United States. She thus concludes that the first Espinoza-Seanez requirement was not satisfied and that her search and seizure cannot be qualified as having been made under the extended border search doctrine. Again, we disagree.

Despite Cardenas' argument otherwise, continuous surveillance is not a requirement of an extended border search. Niver, 689 F.2d at 527; United States v. Ingham, 502 F.2d 1287, 1291 (5th Cir. 1974), cert. denied, 421 U.S. 911 (1975); see also

16

United States v. Driscoll, 632 F.2d 737, 739 (9th Cir. 1980).[5]

Furthermore, although the "reasonable certainty" standard, which

governs our inquiry into whether a border crossing has occurred,

requires more than probable cause, it does not require knowledge

beyond a reasonable doubt.  Espinoza-Seanez, 862 F.2d at 531.

The "reasonable certainty" standard requires that

> "the totality of facts and circumstances within the
> [government] officers' knowledge of which they have
> reasonably trustworthy information be sufficient in the
> light of their experience to warrant a firm belief that
> a border crossing has occurred."

United States v. Corral-Villavicencio, 753 F.2d 785, 788 (9th

Cir. 1985) (quoting United States v. Tilton, 534 F.2d 1363, 1366-

67 (9th Cir. 1976)).  Moreover, that a border crossing has

occurred may be inferred from circumstantial evidence.  See

Delgado, 810 F.2d at 484 n.2 (explaining that government

officials need not actually observe a border crossing in order

for their search to be considered reasonable).  For example, in

United States v. Barbin, 743 F.2d 256, 261 (5th Cir. 1984), this

court concluded that it was "reasonably certain" that a sailboat

and trailer had crossed the United States border from Mexico

because (1) an informant had reported to customs inspectors that

the boat and trailer were approaching the border on the Mexican

---

[5] We have, however, indicated that constant surveillance is
one way in which the government can demonstrate that there had
been no change in the condition of person or vehicle being
searched between the time of the border crossing and the time of
the search itself and that the contraband was present at the
border crossing.  United States v. Niver, 689 F.2d 520, 527 (5th
Cir. 1982); United States v. Richards, 638 F.2d 765 (5th Cir.),
cert. denied, 454 U.S. 1097 (1981); see also United States v.
Alfonso, 759 F.2d 728, 735 (9th Cir. 1985).

17

side of the Rio Grande River; (2) the boat and trailer were later sighted within 25 miles of the border on the United States side; (3) the boat and trailer were found with sand and river mud on them; and (4) trailer tracks, which matched the trailer, were found at the border river crossing.

Additionally, in United States v. Delgado, we upheld the district court's determination that the search of a truck qualified as an extended border search because there was a "reasonable certainty" that the contraband found in the truck had crossed the border. 810 F.2d at 484. In Delgado, James Marchant, a customs investigator, received information that a drug smuggling operation was using a specific crossing on a farm on the Rio Grande River to smuggle marijuana into the United States from Mexico. Id. at 481. Marchant was informed that a convoy of vehicles had left Juarez, Mexico, headed downriver on the Mexican highway to the crossing at the farm and that before 9 p.m. the marijuana was to be offloaded from one of the vehicles-- a large truck capable of carrying tonnage--and smuggled across the border into the United States. Id. at 482. Relying on the past credibility of his informant, Marchant established surveillance at the farm with another customs official, both of whom were positioned so that traffic not coming from the border area had to pass one of the two inspectors. Id.

When Marchant saw a truck driving away from the border on the road out of the farm at 7:30 p.m., Marchant concluded that it had come from the border area because it had not passed either

him or his partner.  Id.  Marchant then followed the truck on the highway, and when a car passed him to travel with the truck, he concluded--from his experience--that the car was a "heat vehicle," traveling in tandem with the truck to ensure that the truck reached its destination.  Id.  This court upheld Marchant's subsequent stop and search of the truck under the extended border search doctrine, concluding that there was sufficient evidence to show beyond a "reasonable certainty" that the contraband had crossed the border.  Id. at 484.

Evidence in the instant case is also circumstantial. Testimony indicates that Cardenas' co-defendant Lawal appeared nervous and was very evasive in answering routine questions posed to him by Inspector Valdez as he attempted to cross the border, that a patdown search of Lawal rendered razor blades (for which Lawal attempted to fight), a roll of transparent tape, and a picture of Cardenas, and that a strip search of Lawal brought forth a United States passport issued to Cardenas that contained visa stamps for the Philippines, which Lawal attempted to hide. Specifically, Valdez testified that based on his past experience, the presence of the razor blades, as instruments commonly used in the cutting of heroin and cocaine, raised his suspicion that Lawal was involved in narcotics trafficking.  He further testified that because his experience had shown that drug smugglers often travel in pairs and split up as they go through customs to avoid detection, he discontinued the search of Lawal to brief Inspector Soledad, his supervisor, of his suspicions--

19

i.e., that Lawal and Cardenas were partners in a smuggling scheme and that Cardenas had recently crossed the border and was somewhere nearby. He also attested that Cardenas' passport with visa stamps from the Philippines, which was recognized by inspectors as a "high source country for narcotics," made him very suspicious of her involvement in a smuggling scheme. Moreover, Soledad testified that Cardenas was found not more than a block away from the border crossing, standing next to a wall near a store, within minutes of his proceeding to look for her.

The evidence provided by the searches of Lawal, Valdez's familiarity with the modus operandi of drug smugglers in crossing the border in pairs, Valdez's briefing of Inspector Soledad on his suspicions about Cardenas and Lawal, the location at which Cardenas was found, and the short time frame during which the inspectors discovered Cardenas' picture and passport with Lawal and then found Cardenas herself near the border indicate a "high degree of probability" or a "reasonable certainty" that Cardenas had crossed the border. Thus, the district court did not err in concluding that the government had sufficiently demonstrated the first factor enunciated in Espinoza-Seanez.

(ii). Reasonable certainty of unchanged condition

Cardenas also argues that the district court erroneously concluded that the government had established the second Espinoza-Seanez factor, i.e., a reasonable certainty that there had been no change in Cardenas' condition from the time of the border crossing until the time of the search and that the heroin

20

found on Cardenas' person had been present when she crossed the border. She asserts that Inspector Alvarado, who allowed her to pass through the pedestrian lane without inspection, did not notice her looking "bulky around the waist" and that no one testified whether she looked the same when she crossed the border as when she was confronted in El Paso. We are, however, unpersuaded by Cardenas' argument.

Testimony supports the district court's finding that between fifteen and thirty-five minutes elapsed between the time Inspector Alvarado passed Cardenas through the pedestrian lane and the time Inspector Soledad encountered her in El Paso--not more than a block from the border. Furthermore, the district court found Inspector Hasan's testimony to be convincing. Hasan testified not only to the difficulty of removing the girdle from Cardenas' body but also to the difficulty of placing the girdle around Cardenas' waist with the bulky, plastic packages underneath. Hasan also testified that it would have been difficult for Cardenas to put on the girdle and the plastic packages quickly and extremely difficult for her to have done so with no help. Specifically, Hasan testified that Cardenas required assistance to position one of the packages of heroin underneath the girdle she was wearing as it was positioned, i.e., on her back.

Cardenas argues, however, that it is ludicrous to believe that she could not have put on the girdle in a restroom or dressing room in one of the nearby El Paso shops. She also

21

asserts that because Hasan testified that it took approximately five minutes to help Cardenas put the girdle on, Cardenas had plenty of time to do so during the fifteen to thirty-five minutes when she was unobserved in downtown El Paso.

We again emphasize that continuous surveillance is not a requirement of an extended border search. Niver, 689 F.2d at 739; Driscoll, 632 F.2d at 739; Ingham, 502 F.2d at 1291. This court has also upheld border searches in which defendants have remained unobserved for periods of thirty minutes, United States v. Ramos, 645 F.2d 318, 321 (5th Cir. 1981), and fifty-five minutes, United States v. Walters, 591 F.2d 1195, 1198 (5th Cir.), cert. denied, 442 U.S. 945 (1979). Although the searches conducted in Ramos and Walters were each deemed a functional equivalent of the border search, and not an extended border search as the district court decided in the instant case, our discussion in those cases aids our analysis of Cardenas' situation.

In Walters, for example, fifty-five minutes had elapsed between the time the defendant passed through the airport customs enclosure to the time a customs agent requested that she return to the customs enclosure. 591 F.2d at 1198. During that fifty-five minute period, the defendant testified that she had gone upstairs to the end of the airport terminal building, into a drugstore where she bought a soda and looked at magazines, and returned to the airport lobby. Id. We took into account the defendant's limited activities during the fifty-five minute

22

period, that her clothing was unchanged when she returned to customs, and that cocaine had been taped to her body under heavy clothes and a girdle to determine that a reasonable fact finder could conclude that the cocaine was in the same position on the defendant's person as it had been when the defendant entered the country.  Id.

In Ramos, we reviewed the district court's determination that the government demonstrated with "reasonable certainty" that the contraband found on the defendant had recently crossed the border.  The defendant had been approached by customs officials within thirty minutes of leaving the airport customs enclosure. 645 F.2d at 320-21.  The defendant testified that during that thirty-minute period he had checked into the airport hotel which was part of the terminal complex.  Id. at 321.  However, there was no indication that the defendant had gone to his room because he had not changed clothes since his departure from the customs enclosure and was carrying the same briefcase.  Id.  A patdown search of the defendant eventually revealed a package of cocaine taped to the defendant's leg and covered by an ace bandage.  Id. at 320.  In agreeing with the district court that it was "reasonably certain" that the cocaine found on the defendant had crossed the border, we explained:

> The government is not required to negate every hypothetical possibility as to how the contraband may have been obtained subsequent to the border crossing. In this case, the mere assertion by the defendant that there was the opportunity to obtain the contraband after the border crossing is insufficient to controvert the facts established by the government.  Although opportunity is, of course, one factor, and might be the

23

> controlling factor if the contraband were found loose in a pocket or purse, the court finds that it is highly unlikely that cocaine obtained after a long international flight, late at night almost contemporaneously with registration in a hotel, would be carried in the manner of the cocaine found in this case.

Id. at 321 (emphasis added).

In light of our discussion in Walters and Ramos, and after reviewing the evidence in the instant case on which the district court made its factual findings, we cannot say that the district court erred in determining that the government demonstrated a reasonable certainty that Cardenas, and thus the heroin secured to her person, had not changed in condition between the time she crossed the border and the time she was found in El Paso. We therefore find Cardenas' contention to be without merit.

(iii). Reasonable suspicion of criminal activity

Finally, Cardenas contends that the inspectors who found her in El Paso had at best a generalized suspicion that she was involved in criminal activity but no "particularized suspicion." She asserts that the inspectors who encountered her in El Paso noticed nothing suspicious about her when they approached and that the inspectors who suspected Lawal of drug trafficking could not transfer that suspicion to Cardenas simply because Lawal possessed Cardenas' passport. She thus concluded that the district court erred in determining that the third factor enunciated in Espinoza-Seanez, a reasonable suspicion that criminal activity is occurring, had been demonstrated. Again, we disagree.

24

"Reasonable suspicion" of criminal activity must be based on specific facts which, taken together with rational inferences therefrom, reasonably warrant an intrusion. See United States v. Lopez-Gonzalez, 916 F.2d 1011, 1013 & n.3 (5th Cir. 1990) (citing Terry v. Ohio, 392 U.S. 1 (1968), and explaining that factors relevant to the reasonable suspicion inquiry for a Terry stop might also be relevant to the reasonable suspicion inquiry in an extended border search, particularly for those stops in which the transportation of contraband is suspected); United States v. Miranda-Perez, 764 F.2d 285, 288 (noting that the "reasonable suspicion standard reaches to stops for the purpose of investigating not only suspected smuggling of contraband or transportation of illegal aliens but also, in a broader sense, for investigating suspected criminal activity").  We have also made it clear that "reasonable suspicion" of criminal activity is not limited to any particular set of factors. Espinoza-Seanez, 862 F.2d at 531.  Instead, "'each case must turn on the totality of the particular circumstances.'"  Id. (quoting Melenez-Gonzalez, 727 F.2d at 410-11).

Testimony supports the district court's finding that Lawal was concealing Cardenas' passport, a passport marked with visa stamps from the Philippines, which Inspector Valdez recognized as a "high source country" for narcotics.  We have found such evidence to be supportive of a government official's "reasonable suspicion" of the person to whom the passport had been issued. See United States v. Adekunle, 980 F.2d 985, 988 (5th Cir. 1992)

25

(evidence that a person carried a passport from Nigeria, a known narcotics source country, supported the custom agent's reasonable suspicion), cert. denied, 113 S. Ct. 2380, and cert. denied, 113 S. Ct. 2455, vacated in part on reh'g on other grounds, 2 F.3d 559 (5th Cir. 1993). Testimony further supports the finding that Lawal tried to hide Cardenas' passport from the inspectors and that Lawal was also carrying a photograph of Cardenas in his wallet. The district court also found that the inspectors possessed an "abundance of information" supporting a reasonable suspicion of criminal activity, i.e., evidence obtained from the search of Lawal--especially the razor blades which Lawal struggled to keep from the inspectors--and Inspector Valdez's testimony that his experience indicated that drug smugglers often traveled in pairs and crossed the border separately but at approximately the same time. When viewed as a whole, the evidence supports the district court's determination that Lawal and Cardenas were each reasonably suspected of criminal activity. We thus cannot say that the district court erred in determining that the third factor enunciated in Espinoza-Seanez, a reasonable suspicion of criminal activity on Cardenas' part, had been demonstrated.

### 3. *Conclusion*

The district court correctly concluded that the search and seizure of Cardenas was made pursuant to the extended border search doctrine. As such, Cardenas' search and seizure were not unreasonable, and her Fourth Amendment rights were not violated.

26

The district court thus did not err in denying Cardenas' motion to suppress.

### III. DEFENDANT LAWAL

Lawal contends that the district court erred in admitting into evidence at trial Cardenas' statements implicating Lawal in an elaborate scheme to smuggle heroin into the United States because Cardenas did not testify at either the suppression hearing or the trial. He argues that because this evidence was erroneously admitted, his Sixth Amendment right of confrontation and cross-examination was violated under Bruton v. United States, 391 U.S. 123 (1968). Additionally, Lawal contends that Cardenas' statements were hearsay and not competent evidence bearing on the issue of his guilt or innocence. Lawal further maintains that the district court erred in denying his motion for a judgment of acquittal as to all charges because the government did not present sufficient evidence of his guilt. We review each of Lawal's contentions in turn.

#### A. Lawal's *Bruton* Claim

The Sixth Amendment provides a defendant with the right "to be confronted with the witnesses against him." The Supreme Court in Bruton held that this constitutional right to confrontation and cross-examination is violated when (1) co-defendants are tried jointly, (2) one defendant's extrajudicial confession and statement are admitted into evidence and used to inculpate a co-defendant, and (3) the confessing defendant does not testify and

27

is thus not subject to cross-examination.  Id.  Thus, when co-defendants are tried jointly, a pre-trial confession from one cannot be admitted against another co-defendant--even if the jury is instructed to consider the confession only against the confessing defendant--unless the confessing defendant testifies at trial.  Id.  Later decisions of the Court limited Bruton's applicability to situations in which the confessing defendant's confession expressly implicates a co-defendant.  Richardson v. Marsh, 481 U.S. 200, 211 (1987); see Cruz v. New York, 481 U.S. 186, 193-94 (1987); United States v. Restrepo, 994 F.2d 173, 186 (5th Cir. 1993); United States v. Kelly, 973 F.2d 1145, 1150 (5th Cir. 1992); Espinoza-Seanez, 862 F.2d at 534.

The Bruton Court based its reasoning on the fact that despite limiting instructions to the contrary, the jury could not be relied upon to disregard completely the confessing defendant's statement when considering the guilt or innocence of the inculpated defendant.  Id. at 136.  As the Court explained,

> there are some contexts in which the risk that the jury will not, or cannot follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.  Such a context is presented here, where the powerfully incriminating extrajudicial statements of a co-defendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others.  The unreliability of such evidence is intolerably compounded when the alleged accomplice . . . does not testify and cannot be tested by cross examination.

Id. at 135-36.

The application of Bruton to a bench trial, however, is questionable. Nothing in Bruton, or in later Supreme Court cases discussing Bruton, suggests that in a bench trial a judge is incapable of disregarding inadmissible extrajudicial statements implicating a defendant. Moreover, this court has always presumed the contrary: "a trial judge is presumed to rest his verdict on admissible evidence and to disregard the inadmissible." Government of the Canal Zone v. Jimenez G., 580 F.2d 897, 898 (5th Cir. 1978) (quoting United States v. Impson, 562 F.2d 970, 971 (5th Cir. 1977)), cert. denied, 439 U.S. 990 (1979); United States v. Masri, 547 F.2d 932, 936 (5th Cir.), cert. denied, 431 U.S. 932, and cert. denied, 434 U.S. 907 (1977); United States v. Dillon, 436 F.2d 1093, 1095 (5th Cir. 1971).

Other circuits that have addressed the applicability of Bruton to a bench trial have determined that Bruton does not apply. See, e.g., Rogers v. McMackin, 884 F.2d 252, 255-57 (6th Cir. 1989), cert. denied, 493 U.S. 1061 (1990); United States ex rel. Faulisi v. Pinkney, 611 F.2d 176, 178 (7th Cir. 1979); United States v. Castro, 413 F.2d 891, 894-95 & n.7 (1st Cir. 1969), cert. denied, 397 U.S. 950 (1970); Cockrell v. Oberhauser, 413 F.2d 256, 258 (9th Cir. 1969); see also 21 CHARLES A. WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5064, at 321 (1977) ("The Bruton rule does not, of course, apply in nonjury trials."). In making its decision, the Sixth Circuit

29

considered whether the Supreme Court's decision in Lee v. Illinois, 476 U.S. 530 (1986), made Bruton applicable to non-jury trials. Rogers, 884 F.2d at 257. We agree with the Sixth Circuit's assessment that Lee did not make Bruton applicable to bench trials.

In Lee, Millie Lee and Edwin Thomas were charged with committing a double murder and were jointly tried in a non-jury trial. 476 U.S. at 536. Thomas, at the time of his arrest, made a confession to police which expressly implicated Lee and which suggested that the two of them had discussed murdering one of the victims immediately prior to the actual murder. Id. at 532. Although Lee also confessed, her confession suggested that Thomas had "snapped" the night of the murders and gave no indication of any type of plan or premeditation. Id. at 535-36. Thomas' confession was admitted into evidence at trial and heavily relied upon by both the prosecution and the defendants. Id. at 536. Neither of the defendants testified at the trial. Id. In finding Lee guilty, the judge expressly relied on portions of Thomas' pre-trial confession as substantive evidence against Lee. Id. at 538. The Supreme Court held that such reliance violated Lee's Sixth Amendment right to confrontation. Id. at 547.[6]

The issue specifically addressed in Lee was whether the trial judge's reliance upon Thomas' pre-trial confession, not the

_____

[6] We note that the Lee Court did not foreclose the possibility, however, that such a reliance was harmless "when assessed in the context of the entire case against Lee." Lee, 476 U.S. at 547.

30

admission of such a confession, violated Lee's Sixth Amendment right to confrontation.  Id. at 531.  Moreover, the Court observed that Lee was "not strictly speaking a Bruton case."  Id. at 542.  Bruton, the Court explained, was based "on the fact that a confession that incriminates an accomplice is so . . . 'devastating' that the ordinarily sound assumption that a jury will be able to follow faithfully its [limiting] instructions could not be applied."  Id. (emphasis added).

We therefore agree with the Sixth Circuit that automatically "[t]o apply Bruton to bench trials would be to conclude that judges, like jurors, may well be incapable of separating evidence properly admitted against one defendant from evidence admitted against another."  Rogers, 884 F.2d at 257.  Furthermore, absent an express reliance by a trial judge on a non-testifying defendant's pre-trial confession--which facially implicates a co-defendant--in determining that co-defendant's guilt, we do not see how a Sixth Amendment confrontation issue can arise in a bench trial.  No such express reliance exists in the instant case.

In light of the Supreme Court's rationale in Bruton and Lee and this circuit's case law which recognizes the presumption that a judge in a bench trial has no difficulty in disregarding inadmissible evidence in reaching his verdict, we thus agree with our sister circuits who have determined that Bruton is

31

inapplicable to bench trials.[7]  Lawal's reliance on <u>Bruton</u> is therefore misplaced.

### B. <u>Cardenas' Admission as Hearsay</u>

Lawal also contends that the district court erred in admitting Cardenas' admission, which implicated Lawal in an elaborate scheme to smuggle heroin into the United States, because her admission was inadmissible hearsay as to Lawal and not competent evidence bearing on the issue of Lawal's guilt or innocence.  He thus argues that his conviction should be set aside because the admissible evidence was not sufficient to establish his guilt.

### 1. *Standard of Review*

The prejudicial impact of erroneously admitted evidence in a bench trial is presumed to be substantially less than it might have been in a jury trial.  <u>United States v. Hughes</u>, 542 F.2d 246, 248 (5th Cir. 1976); <u>United States v. Nicholson</u>, 492 F.2d 124, 124 (5th Cir. 1974).  Moreover, "'a judge, sitting as a trier of fact, is presumed to have rested his verdict only on the admissible evidence before him and to have disregarded that which is inadmissible.'"  <u>Jiminez G.</u>, 580 F.2d at 898 (quoting <u>Impson</u>, 562 F.2d at 971); <u>Hughes</u>, 542 F.2d at 248; <u>Dillon</u>, 436 F.2d at 1095.  Any error the judge makes in admitting evidence is thus

---

[7] We also point out that at least two commentators have cited the Supreme Court's decision in <u>Lee</u> for the proposition that <u>Bruton</u> is inapplicable to bench trials.  <u>See</u> 21 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence § 5064, at 173 n.33 (West Supp. 1993).

harmless if there exists other admissible evidence sufficient to support the conviction.  <u>Jiminez G.</u>, 580 F.2d at 898.

Our standard of review in reviewing the ultimate finding of guilt by the district court is a substantial evidence test. <u>United States v. Puente</u>, 982 F.2d 156, 158-59 (5th Cir.), <u>cert. denied</u>, 113 S. Ct. 2934 (1993); <u>United States v. Rosas-Fuentes</u>, 970 F.2d 1379, 1381 (5th Cir. 1992); <u>United States v. Jennings</u>, 726 F.2d 189, 190 (5th Cir. 1984).  Thus, this court should sustain Lawal's conviction if the district judge's finding is supported by any substantial evidence.  <u>United States v. Richardson</u>, 848 F.2d 509, 511 (5th Cir. 1988); <u>Jennings</u>, 726 F.2d at 190.  As we explained in <u>Jennings</u>,

> [w]here a jury has been waived and bench trial held, on appellate review of the ultimate finding of guilt the usual rule is that it must stand if it is supported by substantial evidence.  [Thus,] in reviewing the findings of guilt by a trial court in a non-jury trial, the standard of review of the appellate court "is to determine whether such findings are supported by any substantial evidence.  It is not our function to make credibility choices or to pass upon the weight of the evidence.  The test is whether the evidence is sufficient to justify the trial judge, as trier of the facts, in concluding beyond a reasonable doubt that the defendant was guilty . . . ."

726 F.2d at 190 (quoting <u>Gordon v. United States</u>, 438 F.2d 858, 868 n.30 (5th Cir.), <u>cert. denied</u>, 404 U.S. 828 (1971)) (internal citations and quotations omitted).

In applying this substantial evidence test, we must consider the evidence in the light most favorable to the government. <u>Rosas-Fuentes</u>, 970 F.2d at 1381; <u>Richardson</u>, 848 F.2d at 511. "We must likewise 'defer to reasonable inferences of fact drawn

33

by the trial court.'"  Richardson, 848 F.2d at 511 (quoting

United States v. Reeves, 782 F.2d 1323, 1326 (5th Cir.), cert.

denied, 479 U.S. 837 (1986)); see Rosas-Fuentes, 970 F.2d at

1381; United States v. Pitts, 428 F.2d 534, 537 (5th Cir.), cert.

denied, 400 U.S. 910 (1970).  Furthermore, our review remains the

same whether the evidence is direct or circumstantial.

Richardson, 848 F.2d at 511; United States v. Lorence, 706 F.2d

512, 518 (5th Cir. 1983).

### 2. *Evidence Supporting Lawal's Conviction*

Lawal was convicted on two counts of drug conspiracy, one

count of drug possession, and one count of drug importation.  See

supra Part I.B.  We need not decide whether the district judge

erroneously admitted Cardenas' hearsay statements, for our review

of the remaining admissible evidence shows that substantial

evidence exists to support the district judge's ultimate finding

of guilt on these charges.  We address each of the charges in

turn.

### a. Conspiracy

To prove the drug conspiracy charges against Lawal, the

government must prove beyond a reasonable doubt (1) that a

conspiracy existed, i.e., that two or more persons agreed to

violate the narcotics laws; (2) that Lawal knew of the

conspiracy; and (3) that Lawal voluntarily participated in the

conspiracy.  United States v. Rodriguez-Mireles, 896 F.2d 890,

892 (5th Cir. 1990); United States v. Natel, 812 F.2d 937, 940

(5th Cir. 1987).  Direct evidence is not required; each element

34

may be inferred from circumstantial evidence.  Espinoza-Seanez, 862 F.2d at 537.

An agreement to violate narcotics laws may be inferred from "concert of action."  Id.; see Natel, 812 F.2d at 940; United States v. Vergara, 687 F.2d 57, 61 (5th Cir. 1982).  Knowledge of the conspiracy may be inferred from "'a collection of circumstances.'"  Espinoza-Seanez, 862 F.2d at 537; Vergara, 687 F.2d at 61.  Evasive and erratic behavior is some evidence of guilty knowledge.  See Richardson, 848 F.2d at 513; United States v. Williams-Hendricks, 805 F.2d 496, 500 (5th Cir. 1986).  Voluntary participation in the conspiracy may also be inferred from a "collection of circumstances."  Espinoza-Seanez, 862 F.2d at 537; Vergara, 687 F.2d at 61; United States v. Marx, 635 F.2d 436, 439 (5th Cir. 1981).  Although mere presence at the scene of the crime or a close association with a co-conspirator alone cannot establish voluntary participation in a conspiracy, United States v. Moreno, 649 F.2d 309, 312 (5th Cir. 1981), presence or association is a factor that, along with other evidence, may be relied upon to find conspiratorial activity by the defendant, Natel, 812 F.2d at 941; see United States v. Magee, 821 F.2d 234, 239 (5th Cir. 1987).

Evidence shows that Lawal and Cardenas left together from the Hotel San Carlos in Juarez, Mexico.  They travelled by taxi together, instructing the taxi driver to take them across the border to El Paso.  Lawal and Cardenas split up to cross the border into the United States, with Lawal waiting approximately

five minutes after Cardenas had passed through a pedestrian lane at the border crossing before he attempted to pass through a different pedestrian lane. Lawal was nervous and evasive in his responses to routine questioning from Inspector Valdez in the pedestrian lane. He manifested unusual behavior when questioned about the reasons for his trip to Mexico.

Although he told Inspector Valdez that he had only been visiting Juarez and that he was staying at the Holiday Inn Hotel in El Paso, a key to Room 17 in the Hotel San Carlos in Juarez was found in his possession. Later, Mexican Judicial Police found four pounds of heroin in Room 17, which was registered in Lawal's name.[8] A small role of transparent tape, $1044 in United States currency, a photograph of Cardenas in Lawal's wallet, and razor blades were also found in Lawal's possession. Lawal tried forcefully to prevent inspectors from taking the razor blades, and a drug dog later alerted to the currency found in Lawal's possession.

Additionally, Cardenas' United States passport, which contained visa stamps from the Philippines, was hidden in Lawal's right shoe. Lawal attempted to hide that passport after it was found. Cardenas was spotted minutes after inspectors had discovered her passport with Lawal. She was not more than a block from the border crossing, standing next to a wall. Later,

---

[8] We note that neither probable cause nor a search warrant was required to search Room 17. The Fourth Amendment does not apply to searches or seizures conducted on foreign soil, even if the search involves agents of the United States government. United States v. Verdugo-Urquidez, 494 U.S. 259, 274-75 (1990).

5.5 pounds of heroin--worth approximately $500,000 wholesale--was found secreted on Cardenas' person by means of a girdle and tape, the same type of tape found in Lawal's pocket.

After being informed of his <u>Miranda</u> rights, Lawal stated that he found Cardenas' passport on the ground near the border crossing, carried it inside his shoe to avoid being detected with another's passport, and intended to turn it in to the proper authorities. He initially reported that he was traveling alone, but later stated that his wife and infant son were waiting for him in El Paso. He also initially denied that he had ever seen Cardenas, but later admitted riding in the taxi with her from the Hotel San Carlos to the border crossing. Furthermore, Lawal denied knowledge of either the presence of Cardenas' picture in his wallet or the heroin confiscated from Cardenas' person.

Reviewing this evidence, albeit circumstantial, in the light most favorable to the government and likewise deferring to reasonable inferences of fact drawn by the district judge, we find the evidence sufficient to prove all of the elements in the conspiracy charge as discussed above. Substantial evidence exists to support an inference of agreement, knowledge, and voluntary participation on Lawal's part to convict him of conspiracy.

### b. <u>Possession with intent to distribute</u>

To prove the possession with intent to distribute charges against Lawal, the government must prove knowing possession of the contraband with intent to distribute. <u>Rosas-Fuentes</u>, 970

F.2d at 1382; Williams-Hendricks, 805 F.2d at 500.  The elements of the offense may be proven by circumstantial evidence alone. Rosas-Fuentes, 970 F.2d at 1382; United States v. Molinar-Apodaca, 889 F.2d 1417, 1423 (5th Cir. 1989).

Possession may be actual or constructive and may be joint among several defendants.  Molinar-Apodaca, 889 F.2d at 1423; Vergara, 687 F.2d at 61.  This court has defined "constructive possession" as "the knowing exercise of, or the knowing power or right to exercise dominion and control over the proscribed substance."  Molinar-Apodaca, 889 F.2d at 1423; United States v. Glasgow, 658 F.2d 1036, 1043 (5th Cir. 1981).  Intent to distribute "may be inferred from the presence of distribution paraphernalia, large quantities of cash, or the value and quality of the substance."  United States v. Munoz, 957 F.2d 171, 174 (5th Cir.), cert. denied, 113 S. Ct. 332 (1992).

Evidence shows that Lawal had in his possession--when he attempted to cross the border--razor blades, tape of the same type that was used to secure the heroin to Cardenas' person, Cardenas' picture and passport, and a large amount of cash to which a drug dog alerted.  Inspector Hasan testified not only to the difficulty of Cardenas alone securing the girdle and drugs on Cardenas' person as they had been secured, but also to the difficulty of removing the girdle and drugs without help.  The taxi driver testified that he had taken Lawal and Cardenas together to the border crossing.  Having reviewed this evidence, along with other evidence presented, see Part III.B.2.a supra, in

38

the light most favorable to the government, we conclude that the district court did not err in determining that Lawal had constructive possession of the heroin found on Cardenas' person and the intent to distribute that heroin.  Substantial evidence exists to support Lawal's conviction for possession with intent to distribute.

### c. Importation

To prove the importation charge against Lawal, the government was required to prove the elements of the possession charge and that Lawal "played a role in bringing the [heroin] from [Mexico] into the United States."  United States v. Hernandez-Palacios, 838 F.2d 1346, 1349 (5th Cir. 1988); Williams-Hendricks, 805 F.2d at 500.  Again, we find substantial evidence to support that Lawal did indeed play a role in bringing heroin from Mexico into the United States.  See Part III.B.2.a supra.

### d. Conclusion

We therefore determine that any error made by the district judge in admitting Cardenas' hearsay statements was not harmful because there exists other sufficient admissible evidence to support Lawal's conviction for the crimes with which he was charged.

### C. Denial of Motion for a Judgment of Acquittal

Finally, Lawal contends that the district court erred in denying his motion for a judgment of acquittal because the

39

government did not present sufficient evidence to support Lawal's conviction.  We disagree.

We first note that the government argues that because Lawal failed to renew his motion for acquittal at the close of all of his evidence, Lawal has waived his sufficiency review on appeal. Citing this court's decision in United States v. Ruiz, 860 F.2d 615, 617 (5th Cir. 1988), the government contends that we should review the sufficiency of evidence for Lawal's convictions under the "manifest miscarriage of justice" standard.  We must point out, however, that the "manifest miscarriage of justice" standard applies only when the defendant fails to move for acquittal at the close of all the evidence in a jury trial.  Rosas-Fuentes, 970 F.2d at 1381.  Because Lawal waived his right to trial by jury and elected a bench trial, his plea of not guilty serves as a motion for acquittal and thus error has been preserved.  Id.; Pitts, 428 F.2d at 535.

Furthermore, because Lawal waived his right to a jury trial and a bench trial was held, we review his sufficiency of the evidence claim according to the substantial evidence test, as discussed in Part III.B.1 supra.  In light of our discussion concerning the sufficiency of the evidence to support Lawal's convictions in Part III.B.2 supra, we find that Lawal's argument concerning the district court's denial of his motion for a judgment of acquittal to be without merit.

IV.  CONCLUSION

40

For the foregoing reasons, we AFFIRM the district court's judgment of conviction and sentence as to each of Cardenas and Lawal.